UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------

In the Matter of the Application of

**Judge Hellerstein**

C.B. on behalf of Z.G. her minor child,

COMPLAINT

Plaintiff,

**07 CV 3419**
Civ. No. _____

- against –

DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK,

Assigned Judge:

Defendant.

-------------------------------------------------------

Plaintiff C.B., on behalf of her minor child Z.G., by her attorneys, the Law Office of Neal H. Rosenberg, alleges as follows:

### NATURE OF THE PROCEEDING

1.   The proceeding herein is an appeal brought pursuant to New York Education Law § 4404.3 and the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. § 1415(g) from a decision dated January 3, 2007 of a state review officer, an employee and agent of the New York State Education Department.

2.   Relief is requested because the decision of the state review officer is both arbitrary and capricious, as well as in violation of the IDEA and the laws of the State of New York, both of which require that children with disabilities receive an appropriate and adequate education.

3.   Pursuant to IDEA 20 USC § 1415 and NY Educ § 4404.1, on or about January

1

25, 2006, the parents of Z.G. filed an amended impartial hearing request

challenging the decision of the Committee on Special Education ("CSE") of the

Department of Education of the City of New York ("DOE") not to classify Z.G.

as a child with a disability. The impartial hearing request sought both to

classify Z.G. as a child with disabilities as well as tuition reimbursement for the

2005/2006 school year for the Dalton School ("Dalton") a non-approved private

school.

4.    In order to prevail under the IDEA, the parents must prove that: the school

district failed to offer the child a free and appropriate education ("FAPE"); their

unilateral placement in the private school was appropriate; and the equitable

considerations support reimbursement to the parents.

## THE PARTIES

5.    Plaintiff is the parent of Z.G. who resides within the New York City School

District.

6.    Defendant Department of Education is a governmental body charged by law

with the responsibility for the operation, management and control of the School

District. The DOE has offices at 52 Chambers Street, New York, New York.

Among other duties, the DOE and the School District are responsible, pursuant

to NY Educ. § 4402.2 and the IDEA 20 U.S.C. § 1400, *et. seq.*, for providing an

appropriate and suitable public education to all children who reside within the

School District. The School District is further responsible through its CSE, for

finding children with disabilities and providing them appropriate individualized

2

education programs.

## JURISDICTION AND VENUE

7. This court has jurisdiction over the subject matter of this proceeding pursuant to 20 U.S.C. § 1415 and 28 U.S.C. § 1331.

8. Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claim that arose in the county of New York.

## BACKGROUND

9. Z.G. attended a gifted program at P.S. 166 from kindergarten through third grade. She had qualified for the program based on her performance on a standardized test.

10. Although she received good grades on her report cards, during third grade Z.G.'s behavior became disturbing. She began to exhibit extreme agitation, psychosis, suicidal ideation, and violent behavior. As a result she was late or absent for a total of 77 days that year, a significant increase from prior years.

11. Her teacher noted that Z.G. was easily distracted, even in the academic setting at school where she had been successful.

12. That same year, in December 2003, Z.G. was diagnosed with severe bipolar disorder with ultra-ultra rapid cycling. Z.G.'s psychologist, Dr. Nancy Austin, explained that Z.G.'s moods could shift many times within a short period of time. Z.G. would exhibit symptoms of severe depression one minute and become elated the next.

13. Z.G.'s parents sought assistance from the school psychologist at P.S. 166, but

3

were rebuffed.  They were not informed that the DOE provides special services to children who are classified as handicapped based on their special needs.

14.    Subsequently, Z.G. received a co-morbid diagnosis of Attention Deficit Hyperactivity Disorder (ADHD).

15.    In order to stabilize Z.G.'s moods and alleviate the symptoms of the mental illness, Dr. Gianni Faedda, Z.G.'s psychiatrist,  prescribed psychoactive medication.  Weekly therapy sessions with a private psychologist, Dr. Nancy Austin, supplemented the medication regimen and provided additional support. Drs. Faedda and Austin direct the Lucio Bini Mood Disorder Center in New York City.

16.    In May 2003, Dr. Faedda "insisted" that Z.G. attend a private school or that the parents home school her.  In making that recommendation, Dr. Faedda implicitly recognized that the school's inattention to Z.G.'s special needs was a cause of significant stress and was exacerbating her condition to the point where Z.G. had become at risk for suicide.

17.    Finally recognizing that the current DOE school environment was no longer appropriate for Z.G., her parents embarked on a search to find an appropriate school that could provide the necessary supports and interventions.

18.    In September 2004, parents enrolled Z.G. at the Dalton School; she has been a student there since that time.

19.    During October 2005, while a fourth-grade-student at Dalton, Z.G.'s parents referred their daughter to the CSE of Region 9 shortly after they learned that the

DOE has an obligation to provide a free and appropriate education to all students with disabilities.

20.    On January 23, 2006, the CSE convened to discuss Z.G.'s educational program. Parent provided the CSE with several reports including those authored by Dr. Janet Jackson, an independent evaluator, and a letter from Dr. Faedda, Z.G.'s treating psychiatrist. Present at the meeting were Z.G.'s mother, Dr. Austin, Z.G.'s teacher Ms. Terpening, and the CSE representatives.

21.    All of Z.G.'s representatives supported the position that Z.G. should be classified as handicapped and receive special education services.

22.    Z.G.'s mother, teacher and psychologist were permitted to speak at the CSE meeting, although they testified that they didn't feel like they had an opportunity to truly participate because the DOE psychologist reflexively rejected their position responding that Z.G. had tested well.

23.    At the end of the meeting, the CSE team refused to classify Zoe as handicapped and concluded that she could attend any general education program without any special services or interventions by the DOE.

24.    The parent rejected the CSE's recommendation and immediately requested an impartial hearing seeking tuition reimbursement for the Dalton School for the 2005/2006 school year.

### THE APPROPRIATENESS OF THE
### PARENTS' UNILATERAL PLACEMENT

25.    Upon the strenuous advice of Z.G.'s psychiatrist, her parents decided that their

daughter should not continue in her public school placement.

26.    Z.G. began Dalton in September 2004, having to repeat third grade because of the age cut-off for the school.

27.    With Z.G. as a new student, presenting unique needs, Dalton created an individualized and comprehensive support system for her that would ensure Z.G.'s continued academic and social progress.

28.    As a small school with only 100 students per grade, Dalton is flexible and tailors interventions and supports to ensure that they continue to meet Z.G.'s needs.  For instance, Z.G.'s fourth grade teacher moved up to fifth grade with Z.G. because the school administration recognized the additional stress that Z.G. would experience when she changed school buildings.

29.    In addition, Dalton provides an educational consultant with special education training to observe Z.G. three times each week.  Based on her observations of Z.G. and her expertise, the educational consultant regularly confers with Z.G.'s teacher, Ms. Terpening, to devise teaching strategies to meet Z.G.'s unique educational needs.

30.    Moreover, Ms. Terpening consults with Z.G.'s other teachers as well as Z.G.'s psychologist and parents to ensure that the interventions continue to produce measurable results, i.e. good grades on her report card.

31.    As credibly testified, Ms. Terpening provides extensive redirection, as well as one-to-one emotional and academic support as needed.

32.    Dalton provides a full-time on-site psychologist who is available to meet with

Z.G. as needed. A full-time nurse also monitors the side effects of her medication.

33.   Although Z.G. is currently stable on her medication, as Z.G. enters puberty, the symptoms of her bipolar disorder become harder to regulate.

34.   Dalton has utilized the nurse's office as a place for Z.G. to decompress when the symptoms of her mental illness become overwhelming.

35.   Although initially successful, Dalton is evaluating the ongoing efficacy of that intervention and is considering other options for the forthcoming school year.

36.   According to Z.G.'s teacher, small class size is essential to Z.G.'s academic and social progress.

37.   Classes at Dalton have 19 children per class with specialties well below that number.

38.   According to the New York State Department of Information, average classes in Z.G.'s home school district, District 3, have 25.2 students in a 5th grade class and 35.4 students in 6th grade. *See*, www.emsc.nysed.gov/irts/2004-2005/2005_Avg-class-size.pdg.

39.   Unlike other programs, Dalton offers an accelerated academic program that both meets Z.G.'s high academic abilities and actually ameliorates the symptoms of her bipolar disorder. Specifically, Z.G.'s ability to hyper-focus on challenging and engaging material actually prevents psychiatric decompensation. Therefore, it is precisely the academic rigor of Dalton that allows Z.G. to progress academically.

## THE IMPARTIAL HEARING

40.  At the Impartial Hearing, Hearing Officer Jason Stern carefully weighed the evidence before him and testimony heard, and determined that the DOE should have classified Z.G. as a child with a disability.  Specifically, Hearing Officer Stern determined that Z.G. was Other Health Impaired as her bipolar disorder affected her education.

41.  He recognized that "possessing superior intelligence does not disqualify a child from an appropriate education and services."

42.  Finding credible the extensive testimony of both the parent and Ms. Terpening, HO Stern recognized that the CSE should have looked beyond the results of the standardized tests and Z.G.'s report card.

43.  As evident in his opinion, HO Stern evaluated the testimony of Z.G.'s psychiatric history including the undisputed expert and anecdotal evidence of Z.G. psychiatric symptoms.  Moreover, he considered the facts that Z.G. receives medication, therapy, as well as educational and emotional supports.  In other words, he looked at Z.G. and her grades within the context of the symptoms of her disorder.

44.  HO Stern concluded that the testimony presented by Z.G.'s teacher demonstrated that the manifestation of the symptoms of the disorder "more likely than not" had negatively impacted on her grades.

45.  Moreover, HO Stern accepted the credible testimony from Ms. Terpening, Dr. Austin and Z.G.'s mother, that Z.G. needs the extensive and comprehensive

system of interventions provided at Dalton, including but not limited to a special educational consultant, an on-site psychologist, an on-site full-time nurse and small class size in a small school.

46. HO Stern also determined that Dalton was an appropriate placement as demonstrated by the fact that Z.G. is making academic progress – despite the symptoms of bipolar disorder – but only within the comprehensive system of interventions which have ensured her academic progress.

47. Finally, H.O. Stern concluded that the equitable considerations supportedt the parents, as there was uncontroverted testimony that they fully participated in the process.

48. At the hearing, the parent testified that she would evaluate a public school placement to determine its appropriateness for her daughter.  Z.G. had attended public school from kindergarten through third grade and only removed her from that setting following severe manifestation of her mental illness combined with the strong advice of her doctors.

49. Thus, HO Stern granted the parent's request for tuition reimbursement for the 2005-2006 school year.

## PROCEEDINGS BEFORE THE STATE REVIEW OFFICER

50. On or about October 13, 2006, the DOE filed to appeal the decision of the IHO.

51. The DOE claimed that the C.S.E. was correct in not classifying Z.G. as handicapped because she had tested well on standardized tests and was not failing any subjects.

52.   Moreover, the DOE claimed that the decision to send Z.G. to Dalton was based on the parents desire to send their child to a prestigious private school.

53.   The parents sought to affirm the decision of the hearing officer as the decision of HO Stern was, in fact, correctly decided.

54.   First, the parents asserted that Z.G. should have been classified as Other Health Impaired, as the testimonial evidence demonstrated the extent to which Z.G. received structure, supports and intervention in order to maintain Z.G.'s stability and academic progress.

55.   Moreover, the parents opined that while they initially sought to send their daughter to private school on the advice of Z.G.'s psychiatrist, they continued to send her to Dalton because it had created an appropriate and comprehensive program that was appropriate for their daughter.

56.   The State Review Officer sustained the appeal determining that the CSE was correct in its decision not to classify Z.G. as handicapped despite her well-documented severe bipolar disorder co-morbid with ADHD.

57.   In sustaining the appeal, the State Review Officer apparently gave little or no weight to the testimony of Z.G.'s teacher, psychologist and mother – three individuals who are keenly familiar with the way in which the symptoms of Z.G.'s bipolar disorder negatively impact on Z.G.'s education.

58.   The State Review Officer is, in effect, punishing Z.G. for her parents' decision to remove Z.G. from a place in which she was beginning a steep downward spiral – as manifested by her psychosis and suicidality, represented on the report

10

card by an extraordinary number of latenesses and absences – and placed her in an appropriate academic setting.

59.  Z.G.'s intelligence should not overshadow the fact that she needs the small structured setting, the individualized instruction and the comprehensive support system with onsite counseling and monitoring of side effects that Dalton is able to provide.

60.  The State Review Officer arbitrarily gave substantial weight to the report of Marilyn Mash who admitted that her observation of Z.G. might not have been representative of Z.G. at all.

61.  Similarly, the SRO arbitrarily gave credibility to the unsupported DOE representations that any teacher at any public school would provide the same structure to Z.G. that Dalton provides.  Moreover, there was no testimony at all indicating that there would even be a special education consultant on staff to coordinate and regularly monitor any learning issues.

62.  The SRO also erred in giving substantial weight to the credibility of the psychologist employed by the DOE.  The psychologist's testing conditions – a highly structured set of exercises performed in a one on one setting over a full day, actually re-created the kind of environment that has allowed Z.G. to thrive. Z.G. was allowed to "hyper-focus", and apply her natural abilities without the stressors that can cause her to decompensate.

63.  The conclusion that a public school is more flexible than Dalton defies logic. The fact that the DOE employs many types of mental health professionals does

not lead to the conclusion that a school has the option to choose from a variety of mental health professionals.

64.    Moreover, there is no reason to presume that Z.G. would receive any services from a mental health professional without such services being mandated by the DOE.

65.    Finally, the State Review Officer's decision is fraught with contradictions. For instance, in order to find her not handicapped, he concludes that Z.G.'s bipolar disorder does not interfere with her education. At the same time, he concludes that Dalton is not appropriate because any public school could provide all the essential structure and supports including, but not limited to refocusing, counseling, coordinated educational interventions and monitoring medication side effects. In so doing, he implicitly recognizes Z.G.'s extensive educational needs as a handicapped individual.

66.    Given that the Impartial Hearing Officer personally heard and evaluated the testimony presented before him, the State Review Officer should not have so readily and arbitrarily discounted the Impartial Hearing Officer's interpretation of the testimony and evidence regarding the procedural and substantive appropriateness of the CSE's decision not to classify Z.G. as a child with a disability.

WHEREFORE, it is respectfully requested a judgment be made and entered:

    a.    reversing in its entirety, the State Review Officer's finding that the Department of Education of the City of New York had appropriately

12

failed to classify Z.G. as handicapped;

b.  upholding the Impartial Hearing Officer's finding in its entirety that

the parents met their burdens of proving the appropriateness of their

recommended placement at the Dalton School;

c.  upholding the Impartial Hearing Officer's finding in its entirety that

a weighing of the equities warrants a full tuition reimbursement; and

d.  for such other and further relief as the Court deems just and proper,

and granting the costs and disbursements of this proceeding.

DATED:    New York, New York
          April 30, 2007

Respectfully submitted,

NEAL HOWARD ROSENBERG (NHR 7827)
Attorney for Plaintiff
9 Murray Street-Suite 4 West
New York, New York 10007
(212) 732-9450

13