UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

In the Matter of the Application of C.B. on
Behalf of Z.G., her minor child                    07 Civ. 3419 (AKH)


                              Plaintiff,


        -against-


DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK,

                              Defendant.

------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT

### 1.        Preliminary Statement

        Plaintiff submits this memorandum of law in support of her motion for summary

judgment.

### 2.        Procedural History

        This matter arises pursuant to the Individual with Disabilities Education Act

 (hereinafter "IDEA") 20 U.S.C. §1400 et. seq. (2006).  The parents on behalf of Z.G.

submitted a request for an impartial hearing because the Department of Education of the

City of New York (hereinafter "DOE") at an Individual Educational Plan (hereinafter

"IEP") meeting held on January 23,  2006, refused to classify Z.G. handicapped, despite

the fact that she has been diagnosed with a very severe case of bipolar disorder and a co-

morbid diagnosis of Attention Deficit Hyperactivity Disorder (ADHD).  As a result of

1

DOE's refusal to designate Z.G. as handicapped, Z.G. was referred to a general education program. Thus, she was not eligible for any support services whatsoever.

Because the IEP team refused to designate Z.G. as handicapped and eligible for services, the parents on behalf of Z.G. requested an impartial hearing, dated January 25, 2006. An Impartial Hearing was held on May 5, 2006 and June 2, 2006 to determine the issue of eligibility and tuition reimbursement for Z.G.'s attendance at the Dalton School for the 2005-2006 school year. The finding of fact and decision was rendered on September 11, 2006.

At the Impartial Hearing, Hearing Officer Jason Stern (HO) carefully weighed the evidence before him and testimony heard and determined that the DOE should have classified Z.G. as a child with a disability. Specifically, Hearing Officer Stern found that Z.G. was Other Health Impaired (hereinafter "OHI") due to her bipolar disorder affecting her education. HO Stern accepted the credible testimony of Z.G.'s witnesses that Z.G. needed extensive and comprehensive systems of interventions provided at Dalton including a special educational consultant, an on-site psychologist, an on-site full time nurse, and extensive one to one intervention by Z.G.'s teacher. HO Stern also determined that Dalton was an appropriate placement but only with the comprehensive system of interventions that have allowed her to succeed academically. Finally, H.O. Stern concluded that the equitable considerations supported the parents, that Z.G. had attended public school from kindergarten through third grade and only removed her from public school following a severe manifestation of her mental illness and based on the strong advise of her doctors. Z.G. repeated third grade at Dalton due age requirements at Dalton and attended fourth grade and the parents did not seek tuition reimbursement for those

2

years.  Thus, HO Stern granted the parent's request for tuition reimbursement for the 2005-2006 school year.  (SRO Exhibit 1)

Thereafter, on or about October 13, 2006, the DOE appealed the decision of the IHO claiming that the C.S.E. was correct in not classifying Z.G. as handicapped because she had tested well on standardized tests and was not failing any subjects.  DOE claimed that the decision to send Z.G. to Dalton was based on the parents desire to send their child to a prestigious private school.

The parents sought to affirm the decision of the hearing officer as the decision of HO Stern was correctly decided.  The parents opined that they initially sought to send their daughter to private school on the advise of Z.G.'s psychiatrist, and they continued to send their daughter to Dalton because it had created an appropriate and comprehensive support system which allowed their daughter to succeed despite her profound mental illness.

On January 3, 2007, the State Review Officer (SRO) reversed the decision of IHO Stern determining that the CSE was correct in its decision not to classify Z.G. as handicapped despite the uncontroverted evidence that Z.G. suffers from severe bipolar disorder co-morbid with ADHD.  As a result of the decision, Z.G. is not entitled to any support services whatsoever or intervention strategies.  She is only entitled to a general education program.

On April 10, 2007, plaintiff filed the instant case seeking to annul the decision of the SRO and to reinstate the decision of the Impartial Hearing Officer.

## QUESTIONS PRESENTED

1.      Where a two tier system of review has been established, must the Court strictly defer to the appellate administrative decision maker whose decision is against the weight of evidence or may deference be given to the initial administrative decision maker (similar to a trial judge) who assesses the credibility of the witnesses, possesses expertise in the field of education, and who makes findings of facts and conclusions of law.

2.      Whether the impartial hearing officer, correctly determined that Z.G. who is suffering from a severe bipolar disorder co-morbid with ADHD, should be classified with a disability as Other Health Impaired and thus entitled to special services to remediate Z.G.'s specific disability.

## FACTUAL STATEMENT

Z.G. attended a gifted program at P.S. 16 from Kindergarten through third grade. She had qualified for the program based on her performance on a standardized test. (Transcript, p. 80)    Although she received good grades on her report card in third grade, (2003-2004), Z.G.'s behavior changed.    She exhibited extreme agitation, psychosis, suicidal ideation and violent behavior.   (Transcript, p. 80-81)    During third grade, Z.G. was late and absent for a total of 77 days.  (Exhibit 16)

 Z.G.'s third grade teacher observed that she was easily distracted during school. In public school, Z.G.'s symptoms of bipolar deteriorated.  Z.G. was experiencing problems with sleeping, tantrums, anxiety, obsessions and oppositional behavior.  (Transcript p. 69) She was extremely agitated. She was in constant rages, suicidal ideation, hypo manic episodes, talking nonstop, weeping and laughing interchangeably.   (Transcript p. 80-81) Z.G. was anxious and terrified to go to public school.   She was disorganized, and did not

know what was going on.    (Transcript p. 82)

In December 2003, Z.G. was diagnosed with severe bipolar disorder with ultra-rapid cycling. (Transcript p. 16, 80, and Exhibit C) Bipolar is a neurobiologically based disorder in which the neurobiological system is deregulated.  This means sleep, attention, mood, emotions, self-esteem are all irregular and the system does not have the natural means to re-regulate itself. .  (Transcript p. 17)   A child and adolescent suffering from bipolar illness manifest the illness by having period of mania and depression. (Transcript p. 17)   In periods of mania, Z.G.  was overactive and could not regulate her thoughts. This is commonly referred to as racing thoughts.   Other symptoms, which Z.G. suffers from, are anger, which can be difficult to control, poor sleep and extreme anxiousness. (Transcript p. 17,23) Also, Z.G. received a co-morbid diagnosis of Attention Deficit Hyperactivity Disorder (ADHD). (Exhibit "B")  Z.G. has symptoms of ADHD, non attentive type that manifest itself through a lack of focus, and a difficulty sitting still. (Transcript p. 17)

Z.G. has a very severe case of bipolar disorder because she has ultra, ultra rapid cycling and also has symptoms of a mixed state.  Ultra, ultra rapid cycling means that Z.G.'s mood can swing from moment to moment and because she is in a mixed state she can also be suffering from very depressive thoughts. (Transcript p. 18-20)

Bipolar disorder affects Z.G.'s ability to process new visual and verbal information. (Transcript p. 25)   For example, racing thoughts compete with Z.G.'s ability to focus and depression may make it difficult for her to get motivated.  (Transcript p. 26)  Z.G.'s mood shifts many times within a short period of time.  Z.G. exhibited symptoms of severe depression one minute and become manic within minutes of the depression. (Transcript p.

5

18)

   Z.G.'s parents sought assistance from the school psychologist at P.S. 166, but were

rebuffed. (Transcript p. 86-87)  The parents were not even informed by the DOE that  DOE

provided special services to children who are classified as handicapped based on their

special needs. (Transcript p. 90-93)   In order to stabilize Z.G.'s moods and alleviate the

symptoms of the mental illness, Dr. Gibanni Faedda, Z.G.'s psychiatrist, prescribed

psychoactive mediation.  (Exhibit C)  In addition to the  psychopharmacological

component, Z.G. began weekly sessions with a private psychologist, Dr. Nancy Austin.

(Transcript p. 14) (Exhibit C)

   In May 2003, Dr. Faedda, a psychiatrist that specializes in bipolar disorder, strongly

recommended (insisted) that Z.G. attend a private school, or in the alternative, that she be

home schooled. (Transcript p. 88, 90-92)   Dr. Fraedda's recommendation was based, in

part,  on DOE's inattention to Z.G.'s special needs, which was a cause of significant stress,

which in turn was exacerbating her condition to the point that Z.G. became at risk for

suicide. (Transcript p. 81-82)  The parents embarked on a search to find an appropriate

school that could provide the necessary support and intervention. (Transcript p. 89)

   In September 2003, the parents enrolled Z.G. at the Dalton School where she has

remained to date.  She had to repeat third grade due to the age requirements at Dalton.

During October 2005, while a fifth-grade-student at Dalton, Z.G.'s parents referred their

daughter to the CSE of Region 9 shortly after they learned that the DOE has an obligation

to provide a free and appropriate education to students with disabilities.  On January 23,

2006, the CSE convened to discuss Z.G.'s educational program.  Present at the meeting

were Z.G.'s mother, Dr. Austin, Ms. Terpening (Z.G.'s teacher),  and CSE representatives.

6

(Exhibit 11)  The parents provided the CSE Committee with several reports including reports by Dr. Janet Jackson, an independent evaluator and  Dr. Faedda, Z.G.'s treating psychiatrist.  (Exhibits B and C)

All of Z.G.'s representatives opined that Z.G. should be classified as handicapped and receive special educational services.  (Exhibits B and C) (Transcript p. 29, 30, 48, 49, 50-52, 69, 107-08, 171-6, 348)  Z.G.'s doctors and teacher had extensive experience treating Z.G.'s bipolar disorder. (Exhibit C) (Transcript p. 14,, 16, 154-55, 161

Dalton created an individualized and comprehensive support system that would insure that Z.G.'s academic's needs would be met. (Transcript p. 157-161, 165-67, 170)  As a small school with only 100 students per grade, Dalton is flexible and tailors interventions and supports to ensure that Z.G.'s needs are met. (Transcript p. 157-161, 165-67, 170) For example, Z.G.'s fourth grade teacher moved up to fifth grade with Z.G. because the Dalton recognized the additional stress that Z.G. would experience when she changed school buildings and thus eliminated an additional stressor.  (Transcript p. 161) Dalton provided an educational consultant with special educational training to observe Z.G. three times each week.  Based on her observations of  Z.G. and her expertise, the educational consultant regularly conferred with Z.G's teacher, Ms. Terpening, to devise teaching strategies to meet Z.G.'s unique educational needs.  (Transcript p. 160-61, 166)

Ms. Terpening regularly consulted with Z.G's other teachers, psychologist, and parents to ensure that the interventions continued and that any problems that surfaced were dealt with immediately.  (Transcript p. 158, 160-161)   Ms. Terpening provided extensive redirection, and one to one emotional and academic support.  (Transcript p. 158, 160-61)

7

Dalton provided a full-time on-site psychologist who was available to meet with Z.G. as needed. (Transcript p. 158) Dalton also employs a full-time nurse that monitors the side effects of her medication. (Transcript p. 158) The nurse's office is utilized as a place for Z.G. to decompress when the symptoms of her mental illness become overwhelming. (Transcript p. 192)

Small class size is essential to Z.G.'s educational progress. (Exhibit B and C) (Transcript p. 29, 174) Dalton average class size is 19 children per class with many specialty classes much smaller. (Transcript p. 161) According to the New York Department of Information, average classes in Z.G.'s home school district have 25.2 students in 5th grade and 35.4 students in 6th grade.

Z.G.'s ability to hyper-focus on challenging and engaging material actually prevents psychiatric decompensation. (Transcript p. 26-29) Dalton offers an accelerated academic program that meets Z.G.'s high academic abilities which in turn ameliorates the symptoms of bipolar disorder. (Transcript p. 174-76) If the program is not challenging enough for Z.G., she will lose the ability to focus, she may become anxious and the manic symptoms will begin to take over. (Transcript p. 52, 89)

Despite a profound mental illness, (bipolar) the CSE refused to classify Z.G. as handicapped and recommended a general education program without any special services or interventions by DOE. (Exhibit 11) Despite being gifted in many areas, Z.G. remains fragile and needs small classrooms, positive reinforcement, one on one support as much as practical, an opportunity for breaks, a place where she can decompress when her symptoms take over enabling her to refocus, extra time in a quiet setting for testing and access to a school psychologist at any time during school hours. (Transcript p. 29, 48-51)

8

Since Z.G. has enrolled at Dalton, she has stabilized.  (Transcript p. 108)   Dalton is academically appropriate, with a tremendous amount of one on one support, an open door to counseling anytime with the school psychologist, a learning specialist that attends class three times a week to offer teaching strategies, and the nurse's office to let her decompress when her symptoms manifest itself. .  (Transcript p. 113-114, 122-23, 156-57)  Dr. Faedda, Z.G.'s treating psychiatrist who specializes in early onset of bipolar in children and adolescents issue a report dated December 14, 2005 which states in relevant part:

> "In spite of considerable improvement, Z.G. remains impulsive, over-excitable, at times inappropriate or aggressive, and can be demanding, bossy and rigid.  Her uneven academic and social functioning interferes with her education, and an individualized educational program is needed to meet her needs.
>
> In spite of being extremely gifted in many areas, Z.G. remains fragile and can benefit from attending smaller classes, increased 1:1 teaching, greater flexibility with academic activities and increased support when her symptoms interfere with school and social functioning.
>
> We hope that this information will help you confirm the medical necessity for placement in an adequate school setting and the importance of continued treatment." (Exhibit 9 and Exhibit C)

A report of Psychological and Neuropsychological testing prepared in January 2006 by

Dr. Janet E. Jackson, a psychologist, opined:

> "Overall, Z.G.'s Bipolar Disorder is co morbid with Attention Deficit Disorder: Inattentive Type.  Highly discrepant scores among composite Scores on the WISC-IV and within cognitive areas (e.g., Processing Speed) indicated that she might experience some learning difficulties as she proceeds through school.  …….  Although current medication may mitigate issues with attention and concentration to some degree, Z.G. continued to respond impulsively.  She needed to survey visual information thoroughly and for longer time frames that some tasks allowed…." (Exhibit 10)

Dr. Reinstein issued a visual information processing evaluation, dated 02/10/06.

Dr. Reinstein concluded the following:

9

"Convergence Insufficiency, Accommodative Insufficiency, Ocular Motor
Dysfunction and Mild Perceptual Dysfunction in Visual Closure…..
Z expends greater than 60% of her visual energy trying to keep her work clear and
single. She has great difficulty with her visual processing when her visual system is
stressed. . ..

Because of Z.G.'s extreme visual stress, I recommend that she receive extra time
on school exams and standardized testing.  Z.G. would also benefit from a smaller
classroom setting. (Exhibit A)

There were times at Dalton, that Z.G. was very depressed, upset and crying
when she could not calm down.  She would go to the school psychologist or visit the
school nurse to regain her composure.  (Transcript p. 157)   There were times at Dalton
that Z.G. became manic by exhibiting a fast speech pattern, going off on tangents, and
having a hard time controlling her outbursts.  During these episodes, Z.G. needs a lot of
structure and support from her school to manage her emotions.   (Transcript p. 158)

Z.G.'s teacher is in constant communication with Z.G.'s parents, her psychologist,
Dr. Austin as well as the school psychologist and school nurse. (Transcript p. 160)  Z.G.'s
teacher spends about one hour a day in direct communication with Z.G. and her parents.
She believes it is critical in treating Z.G. that everyone is on the same page.  (Transcript p.
160-61)

Ms. Terpening believes that Z.G. has flourished at Dalton and produced brilliant work
but would not have been able to do so without the extensive support system in place.
(Transcript p. 167).   According to Ms. Terpening, Z.G.'s school teacher for the last two
years, Z.G. should not be placed in a New York City Public School without any support.
She stated that it is "difficult to imagine", she would "suffer on  every level", and her
social and emotional well being would be at a very dangerous level. (Transcript p. 174)

According to Ms. Terpening, Z.G. needs small classrooms, someone to check on her

10

daily maintenance, organization, and assignments, a rigorous curriculum or she will zone out and not engage.   She needs nurse accessibility, school psychologist accessibility, and a teacher support system.  (Transcript p. 174-76)  According to Ms. Terpening, she needs to intervene two or three times a day to keep her on track. (Transcript p. 188)

## OVERVIEW OF THE INDIVIDUALS WITH DISABILITIES IN EDUCATION ACT

Congress enacted IDEA in "an ambitious federal effort to promote the education of handicapped children. *Board of Education v. Rowley*, 458 U.S. 176, 179 (1982).  Toward that end Congress provides federal funds to those states that develop plans to assure "all children with disabilities the right to a free appropriate public education.  20 U.S.C.  ß 1412 (1).  The "free appropriate public education" (FAPE) mandated by federal law must include special education and related services tailored to meet the unique needs of a particular child, 20 U.S.C. §1401 (a)  (18) and be reasonably calculated to receive educational benefits. *Rowley supra* at 207.

IDEA assures and provides all children with disabilities, FAPE. 20 U.S.C. §1400 (c) (3).  An appropriate education program for a child with a disability begins with an Individual Educational Plan (IEP), which is developed at a Committee on Special Education Review Meeting, upon adequate notice to parents and with parental input.  The IEP is the blueprint for a child's educational program for the school year.  It must describe her functional levels, educational strengths and weaknesses and establish annual goals and short term objectives to be attained with the help of the special education services identified to remediate the child's specific disability.  See 20 U.S.C. ß 1414

Parents who are dissatisfied with an IEP have the opportunity to present complaints

11

regarding the identification, evaluation, placement, or provision of a free appropriate

public education to their child . 20 U.S.C. §1415 (b) (1) (E).   Such complaints may be

resolved through an impartial due process hearing.  20 U.S.C. §1415 (b) (2).

The Supreme Court has held that a parent may seek tuition reimbursement for a

unilateral placement in a private school when the school district has failed to offer their

child FAPE.  *Burlington Sch. Comm. v.  Massachusetts Department of Education*, 471

U.S. 359 (1986)  This was later extended by the Court to include private, non-approved

schools.  *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7 (1993)  The right to seek

tuition reimbursement was later codified in the 1997 amendments to IDEA.  20 U.S.C. . ß

1412 (a) (10) (C) (ii).

## ARGUMENT

1.      **A De Novo Review is Required and the Court Should
        Give Great Weight to the Impartial Hearing Officer's Decision Where
        His Decision is Based on the Assessment of the Evidence Presented and
        the Credibility of the Witnesses, and Where the Decision of the SRO is
        Not Supported by the Evidence, is Unreasonable, and is Contrary to
        New York State Law.**

Under IDEA, the role of the Court is not an appellate role.  In fact, the Court must

conduct a *de novo* review of IDEA administrative decision.  *See Walker County School*

*District v. Bennett 203 F.3d 1293 (11th Cir. 2000) cert. denied 531 U.S. 1059 (2000);*  In

fact, Section 1415 (i) (2) (B) states that " in any action brought under this paragraph, the

court (i) shall receive the records of the administrative proceedings; (ii) shall hear

additional evidence at the request of a party; and (iii) basing its decision on the

preponderance of the evidence, shall grant such relief as the court determines is

appropriate   Thus, the Court should receive the entire record of the proceeding in order to

12

be able to conduct a *de novo review.*

IDEA requires the Court to review the findings of the administrative proceeding

and base its decision on the preponderance of the evidence. *Board of Education v. Rowley,*

457 U.S. 176, 206 (1982). However, the provision that a reviewing court bases its decision

on the preponderance of the evidence is by "no means an invitation to the courts to

substitute their own notions of sound educational policy for those of the school authorities

which they review. " *Rowley supra* at 296   Thus, the Supreme Court has further

established that due weight must be accorded to the administrative proceedings.

The mandate to "give due weight" does not require a court to simply approve the

findings of an administrative agency. The Supreme Court amplified this precise point

when it stated:

> "Congress expressly rejected provision that would have so severely restricted the
> role of reviewing courts. In substituting the current language of the statute for
> language that would have state administrative evidence, the Conference Committee
> explained that courts were to make independent decisions based on a
> preponderance of the evidence" citing S. Conf. Rep No. 94-455, p.50 (1975), U.S.
> Code Cong. & Admin. News 1975, p.1503. See also 121 Cong. Record 37416
> (1975) (remarks of Sen. Williams). Rowley supra at 205

The Second Circuit echoed the Rowley holding to wit: "two issues are relevant to a

federal court's review of a challenged IEP:  (1) whether the state complied with the

procedural requirements of IDEA and (2) whether the challenged IEP was reasonably

calculated to enable the child to receive educational benefits." *Rowley supra* at 206-207

and *Walczak v. Florida Union Free Sch. District,* 142 F.3d 119, 129 (2nd Cir. 1998)

While federal courts do not simply rubberstamp administrative decisions, they are

expected to give 'due weight' to these proceedings, mindful that the judiciary generally

lacks the specialized knowledge and experience necessary to resolve persistent and

difficult questions of educational policy.  *Walczak supra* at 129.

The case at bar is complicated by the conflicting decisions of the IHO and SRO. The IHO held that Z.G.'s severe bipolar disorder impacted on her education and thus she should be classified as Other Health Impaired and entitled to support services.  The SRO held that although she is suffering from bipolar disorder, her illness did not impact on her education.  Thus, SRO held that the DOE determination was correct when it designated Z.G. non-handicapped and referred her to the general education program without any support services.

Although some Circuits require deference to the final decision of the administrative authority, other Circuits have held that it may be appropriate to defer to the initial decision maker when his findings are based upon credibility determinations, unless the non-testimonial extrinsic evidence, or the record considered in its entirety would justify a contrary decision.  *O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233,* 144 F.3d 692, 698-99 (10th Cir. 1998) citing *Carlisle Area Sch. V. Scott P.,* 62 F.3d 520, 529 (3rd Cir. 1995).  *But cf. Karl v. Board of Education of Geneseo C. Sch. Dist.*, 736 F.2d 873, 877 (2nd Cir. 1984) reversing a District Court decision regarding student-teacher ratios held appropriate by the Commissioner, the Second Circuit held that deference is due the decision of the final decision maker "where such deference is otherwise appropriate".  If the conclusion of the state review officer, or the impartial hearing officer is unsupported by the record as a whole and incorrect as a matter of law, they simply do not merit deference. *Mr. X v. N.Y.S. Educ. Dep't,* 975 F. Supp. 546 (S.D. N.Y. 1997) citing *Evans v. Bd. Of Educ. Of Rhinebeck Central Sch Dist.,* 930 F. Supp. 83 at 102 (S.D.N.Y. 2003) rejecting the suggestion that deference is due to the SRO decision in the presence of a well-reasoned

decision from the IHO and a SRO decision that failed to address the substantive appropriateness of the IEP.

The IHO's decision was based upon the documents and testimony presented with determinations of credibility as to each of the witnesses. As explained below, the decision of the SRO was not supported by the weight of the evidence, lacks rationality and quite frankly lacks common sense. The SRO decision that a child who is suffering from a severe case of bipolar illness with ultra ultra rapid cycling co morbid with ADHD and visual processing issues somehow would not impact Z.G.'s processing of information required in an educational setting is wrong and not rationally based.

Finally, New York State regulations pertaining to the impact of the SRO decision requires that the decision not constitute binding precedent whatsoever. 8 N.Y.C.R.R. ß 279.12. Section 279.12 states:

> Section 279.12 Decision of State Review Officer.
>
> (a) The decision of the State Review Officer shall be based solely upon the record before the State Review Officer and shall be final, unless an aggrieved party seeks judicial review. The decision of the State Review Officer shall be binding upon the parties and the State Education Department with respect to the provision of special education to the student with a disability involved, **but shall not constitute binding precedent in any judicial action or proceeding or administrative appeal in any forum whatsoever. (emphasis supplied)**

New York State law requires the SRO decision *not* be given any precedent value "whatsoever", Thus, New York State law requires that no weight be given to the decision. To give the SRO decision some weight, would in turn give the SRO decision some precedent value, and would thus be contrary to the plain language of "whatsoever" language set forth in its own regulations.

15

## SRO KELLY IS BIASED AND THUS HIS DECISION IS ENTITLED TO NO WEIGHT

IHO Stern found that DOE did not offer Z.G. a free and appropriate education. However, SRO Paul Kelly overturned the decision of IHO Stern holding that a child suffering from a profound case of bipolar disorder co morbid with ADHD is not educationally handicapped.   Thus, Z.G. was not entitled to any support services, and Z.G. was assigned to general education.

SRO decisions have uniformly favored the District.  Between 2006 and March 2007, only five of forty-three cases to which the IHO ruled in favor of the parents were upheld on appeal when the School District appealed.      Thirty-seven out of thirty-nine consecutive case favored the School District completely.   SRO Kelly manages the office is responsible.   His management has led to a number of attorneys resigning in protest since the office is not following the law.   (See Sun Article attached to memorandum as Exhibit "A").

Thus, the SRO decision is not entitled to any weight and the IHO decision should be given weight in the Court's deliberation.

**2.      The IEP was Procedurally Defective Because DOE Predetermined that it was Not Going to Classify B.G. Educationally Handicapped as Evidenced by the  Fact that it Failed to Involve the Parents, Teacher and Her Doctors in the Creation of the IEP**

It is respectfully submitted that the DOE members of the CSE team predetermined the outcome of the IEP solely based on Z.G.'s test scores and grades at Dalton.  This

conclusion is reached because the DOE members of the CSE team did not allow any real input from the mother, teacher and Z.G.'s doctor.

The IEP produced at the CSE meeting was procedurally deficient in that it failed to involve the parents and her doctors in the creation of their daughter's IEP. The DOE has the obligation to involve them meaningfully in the IEP development process and may not seriously infringe on the parent's participation in the creation or formulation of the IEP. *Application of a Child with a Disability*, Appeal No. 05-087 (internal citations admitted); Also see 8 NYCRR 200.5. When the procedural violation is significant, it causes a denial of FAPE. *Application of a Child with a Disability*, Appeal No. 05-087.

Here, although Z.G.'s mother was present at the meeting, she was not afforded a meaningful opportunity to participate. Z.G.'s mother testified that the CSE failed to elicit from her critical information including but not limited to what Z.G. needed as a result of these evaluations at the meeting (Transcript p. 95-96); a description of Z.G.'s experience when she was in public school (Transcript p. 96-97); why the parents removed Z.G. from public school (Transcript p. 96-97); why Z.G. had been seeing a therapist for more than two and half years (Transcript p. 96-97); and whether she agreed with the non-handicapped classification. (Transcript p. 101). Further, Ms. Terpenning (Z.G.'s teacher for two years) and Dr. Austin (treating psychologist) were not asked pertinent questions by the CSE including whether each agreed with the classification on non-handicapped. (Transcript p. 44, 102, 173)

The CSE effectively stifled any meaningful participation as the mother described the tenor of the meeting under direct examination:

17

MR ROSENBERG:  Did you feel that there was a free flow of thought between the members of the committee, yourself, your daughter's teacher and her therapist.

MS. BERTHEZENE:  Absolutely not . . .  All of testimony of testimony of the teacher . . . was immediately countered by Giselle Jordan saying, well, this is this so that can't be important. (Transcript p. 97-98)

Therefore, the testimony reflects that despite their presence at the CSE meeting, the parents, along with any person advocating on behalf of Z.G., were not afforded a meaningful opportunity to participate in the creation of the IEP.  This is because the DOE members relying on Z.G.'s test scores and grades were not going to designate Z.G. educationally handicapped under any circumstances. The DOE members were not interested in the significant educational interventions by Dalton and her parents that were necessary in order to have Z.G. succeed.  They were not interested in any input from the mother, Z.G's doctors and teacher because the DOE members had predetermined the outcome of the IEP. This procedural violation is substantial and is a denial of FAPE. Therefore, the IEP is procedurally invalid and should be nullified.

3.    **The SRO Incorrectly Held that Z.G. Was Not Educationally Handicapped and Thus Entitled Only to a General Education Program Without Any Support Services When it was Uncontroverted that Z.G. was Suffering From Severe Bipolar Disorder With Ultra Ultra Rapid Cycling Co Morbid with ADHD and Had Visual Processing Impediments.**

a.    **Without an IEP, There is Nothing.**

DOE argues that schools have psychologist and nurses and that much of the intervention strategies employed with Z.G. can be done without necessity of an IEP.

This argument rings hollow and misleads the Court (as it misled the SRO) or in the alternative, reflects a fundamental lack of knowledge regarding education law.

Without an IEP in place designating Z.G. "Other Health Impaired" and setting forth the services that are to be provided, DOE is under no legal obligation to provide any services at all to Z.G.    If the school Z.G. attends does not have a psychologist, or a nurse and the teacher does not employ any intervention strategies, there is no recourse for Z.G. since DOE is under no legal obligation to provide any intervention and learning strategies at all.  Put simply, Z.G. has no legal recourse since DOE was not legally obligated to do anything.

Further, without an IEP in place, there are no regular updates to measure Z.G.'s progress, there are no conferences to take measure of how the intervention strategies are working and whether the strategies have to be adjusted.  Taking DOE's argument to its logical conclusion why have an IEP at all since in many cases DOE can provide services at a school that are typically contained in an IEP.

The answer is simple.  Without an IEP, there is nothing.

**b.  Without an IEP, it is speculation as to whether DOE would provide any services to Z.G.**

Of course without knowing what school Z.G. was going to attend, it is speculation as to whether any intervention strategies could be employed at all. The SRO gave credibility to the DOE representatives that any teacher at any public school would provide the same structure to Z.G. that Dalton provides.  However, not all schools have psychologists and nurses, depending on the size of the school.  (Transcript p. 252) Moreover, DOE could not provide a special education teacher to offer teaching strategies regarding Z.G.  Further, the assertion that a public school teacher who probably has between one hundred to two hundred students, would spend an hour every day with one student, frequently employing one to one teaching strategies, being in constant communication with the school psychologist, Z.G.'s psychologist, the parents and the nurse stretches credibility to the breaking point.  Finally, without testimony from representatives of the school (teacher, nurse and school psychologist) that Z.G. would be attending, it is speculation piled on speculation as to whether these services could be provided.

**c.  The IHO's Credibility Determinations Should Have Bound the SRO and Should Be Binding on this Court if Supported in the Administrative Record.**

It is axiomatic that a trial judge or in this case, an Independent Hearing Officer is in a unique position to assess the credibility of witnesses. Assessment and resolution of conflicting evidence and witness credibility are within the province of an administrative factfinder.  *McKinney v. Bennett,* 2006 N.Y. Slip Op. 05274  9 N.Y. App.Div. 3 Dept., 2006.  The decision of a hearing officer to credit the testimony of witnesses is largely

unreviewable by the courts, which are disadvantaged in such matters because their review is confined to a lifeless record. *Crimmins v. Dennison*, 815 N.Y.S.2d 400  (2006)

The IHO Findings of Fact and Decision found (page 7) that Z.G.'s teacher for the past two years provided credible testimony that her disorder negatively impacted upon her educational performance should have been binding on the SRO and should be binding on this Court because it is well supported in the administrative record.   IHO Stern quoted Ms. Terpening to wit:

> "She definitely exhibits bipolar behavior in that there are days where she will be extremely depressed and very upset.  It can come on very quickly where she will seem-appear fine and then begin crying because something upset her.  It takes a lot to calm her down and sometimes I'm unable to calm her down.  She needs to actually go down and speak with our school psychologist or go down and visit the school nurse.  Other times she will be very high.  She speaks very quickly.  She has a hard time controlling her outbursts.  She'll call out during class.  Sometimes she'll go off on tangents and so she needs a lot of structure in terms of helping her to manage those different emotions when they come up, especially in the context of a structured classroom (transcript p. 158-59)"

IHO Stern reasonably found that Ms. Terpening (who was Z.G.'s teacher for two consecutive years) was the ***best*** person situated to observe Z.G. in her academic environment and  determine the impact of any emotional disorder on a student's performance.  This factual and credibility determination is well supported in the administrative record since Ms. Terpening being Z.G.'s teacher for two years was in fact in the best position to observe Z.G. in an academic setting.

Ms. Terpening believes that Z.G. has flourished at Dalton and produced brilliant work but would not have been able to do so without the extensive support system in place. (Transcript p. 167).  Ms. Terpening also testified that Z.G. should not be placed in a New York City Public School without any support.  She stated that it is "difficult to imagine",

she would "suffer on every level", and her social and emotional well being would be at a very dangerous level. (Transcript p. 174)

According to Ms. Terpening, Z.G. needs small classrooms, someone to check on her daily maintenance, organization, and assignments, a rigorous curriculum or she will zone out and not engage.   She needs nurse accessibility, school psychologist accessibility, and a teacher support system.  (Transcript p. 174-76)  According to Ms. Terpening, she needs to intervene two or three times a day to keep her on track. (Transcript p. 188)

IHO Stern's finding that Ms. Terpening's testimony was credible, competent and well founded is supported by the fact that she was in fact the best person situated to observe Z.G.  SRO not accepting Ms. Terpening's testimony is a clear error.

### d.  DOE's Position that Because Z.G. is Intelligent and Tests Well Bars Her From a Designation of Educationally Handicapped Is Disingenuous

Z.G. is suffering from severe bipolar disorder with ultra ultra rapid cycling, ADHD and visual processing deficiencies.  The only reason that Z.G. has been able to thrive at Dalton is that she was provided a small structured setting, individualized instruction and comprehensive support system with onsite counseling and monitoring.  Her intelligence should not overshadow the fact that she needs these services in order to be successful and without these services in place there is a substantial risk of regression.

e.  **The SRO Decision Acknowledges that Services are Needed and Thus the Decision Is Fundamentally Inconsistent.**

The SRO decision is fundamentally inconsistent.  It is uncontroverted that Z.G. is suffering from bipolar disorder. On one breath, the SRO concluded that Z.G.'s bipolar does not impact on her education.  On another breath, the SRO concluded that Dalton is not appropriate because any public school could provide all the essential structure and support including but not limited to refocusing, counseling, coordinated educational interventions and monitoring medication side effects.  Thus, the SRO directly contradicts the holding of his own decision by acknowledging that the support services are necessary in order for Z.G. to access her education.  (See page 7 of the SRO decision)

f.  **Overwhelming Record Evidence Compels a Finding that the IEP is Substantively Defective because Z.G. Should Have Been Classified as Other Health Impaired, Rather than Non-Handicapped**

Z.G. meets the criteria for "other health-impairment" which is defined as:

> having limited strength, vitality or alertness including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems, including but not limited to a heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, diabetes, attention deficit disorder or attention deficit hyperactivity disorder or tourette syndrome, which adversely affects a student's educational performance.  8 NYCRR §200.1 (zz) (10)

This list of qualifying conditions is not exhaustive.  See *Application of a Child Suspected of Having a Disability*  Appeal No. 02-048;  rather it requires that the DOE investigate whether a medical condition "adversely affects a student's performance."  In addition, Z.G.'s secondary diagnosis is ADHD which is specifically included in the list of handicapping condition that qualify as other health impaired.

23

Bipolar is a neurobiologically based disorder in which the neurobiological system is deregulated.  This means sleep, attention, mood, emotions, self esteem are all irregular and the system does not have the natural means to re-regulate itself.  (Transcript p. 17)   A child and adolescent suffering from bipolar illness manifest the illness by having period of mania and depression. (Transcript p. 17)  Symptoms, which Z.G. suffers from, are anger, which can be difficult to control, poor sleep and extreme anxiousness.   (Transcript p. 17,23) Also, Z.G. received a co-morbid diagnosis of Attention Deficit Hyperactivity Disorder (ADHD). (Exhibit "B")  Z.G.  also has symptoms of ADHD, non attentive type that manifest itself through a lack of focus, and a difficulty sitting still. (Transcript p. 17)

It is inconceivable that Z.G. with a very severe case of bipolar disorder including ultra, ultra rapid  cycling would not impact the processing of information which in turn would impact her education. (Transcript p. 18-20)  Bipolar disorder impacts Z.G.'s ability to process new visual and verbal information.   (Transcript p. 25)   For example, racing thoughts compete with Z.G.'s ability to focus and depression may make it difficult for her to get motivated.  (Transcript p. 26)  Z.G.'s mood shifts many times within a short period of time.  Z.G. would exhibit symptoms of severe depression one minute and become manic within minutes of the depression. (Transcript p. 18)

Z.G.'s treating psychologist and her teacher confirmed the impact of Z.G.'s illness on her education.  Dr. Austin testified in relevant part:

> "Well, the symptoms of bipolar disorder affect attention, affect activity level, affect the ability of one's sense of oneself, one's self esteem. Motivation to initiate, lower if one is depressed and slowed down, one doesn't initiate.  There's a lot of anxiety that comes with not being able to do what is asked.

And then when on the other end of the schema-in when one is too activated, the mind works too hard and there is difficulty consistently with bipolar kids in the ability to follow-with executive skills, to organize and follow through on tasks.  There's difficulty with working memory.  There's difficulty with processing speed and with Z.G. in particular the visual scanning and processing is quite problematic. But the auditory processing is also difficult.

These things wax and wane depending on the symptoms, and with Z.G. these things wax and wane depending on the symptoms and her range of symptoms is particularly wide and severe for all-compare to all the bipolar kids.  She has a very wide range and severity of symptoms.  (Transcript p. 62-63).

Ms, Terpening (teacher) also confirms that Z.G.'s illness substantially impacted her education.

She definitely exhibits bipolar behavior in that there are days where she will be extremely depressed and very upset.  It can come on very quickly where she will seem-appear fine and then begin crying because something's upset her.  It take a lot to calm her sown and sometimes I'm unable to calm her down.  She needs to actually go down and speak with our school psychologist or go down and visit the school nurse.

Other times she will be very high.  She speaks very quickly.  She has a hard time controlling her outbursts.  She'll call out during class.  Sometimes she'll go off on tangents and so she needs a lot of structure in terms of helping her to manage those different emotions when they come up, especially in the contest of a structured classroom.  (transcript p. 158-159)

Ms. Terpening's testimony was equally compelling regarding the necessity for extensive support services for Z.G.  *See Section C supra* in this memorandum.

Dr. Austin echoing the opinion of Dr. Faedda stated that Z.G. needed a small classroom.  She needs increased one on one support (Transcript p. 29, 48)  She requires extra time for taking tests in a quiet room. (Transcript p. 49)  She needs a place for breaks to allow her opportunity to refocus.  (Transcript p. 49)

In sum, the IEP casts Z.G. into the general education program without any support services does not provide Z.G. with FAPE.

**g.    The Placement at Dalton was Appropriate**

IHO Stern succinctly summarized the reasons why the placement at Dalton was appropriate.  Z.G. is making significant academic progress.  Credible testimony established that Z.G. needs a structured school with an individualized program, and a comprehensive system of interventions within the school-in addition to medication and outside therapy to ensure academic progress.  Ms. Terpening testified that all the interventions were essential for Z.G. to achieve any academic success.  (transcript p. 171)  Her opinion was consistent with Dr. Austin and Dr. Faedda. (Exhibit C and transcript 27)  With only 100 students per grade, Dalton is able to respond to Z.G.'s unique educational needs.  For instance, Dalton recognized that because of Z.G.'s disorder, transitions were particularly stressful for her. In order to provide essential stability and structure, Dalton placed Z.G. with Ms. Terpening in 5th grade because as Z.G.'s 4th grade teacher, she had become well acquainted with Z.G.'s educational and psychological needs.  (transcript 164)  Ms. Terpening also provides one-to-one interventions as needed and on a regular basis,  (transcript p. 160, 165), spending an average of one hour each day meeting with Z.G. and consulting with either Z.G.'s parents, her psychologist or other school professionals.  (transcript 161).  A learning specialist, with special education training observes the class three days per week. (transcript p 181, 194)  Based on Z.G.'s educational needs, the special education consultant develops specific strategies to assist Z.G. and consults with Ms. Terpening so that she can help implement these strategies.  Ms. Terpening also consults and coordinates with Z.G.'s other teachers, psychiatrist, psychologist, and her mother.  (Transcript p. 159,

166, 170-171, 182-183), 188). The school also provides a full-time psychologist onsite that Z.G. periodically meets with to help her manage the symptoms of her illness. The presence of a full-time nurse is crucial to help monitor the potential side effects of her medication. The nurse's office also has been utilized to help Z.G. decompress when her anxiety becomes overwhelming and an onsite psychologist also is available for Z.G.

Dalton itself provides a level of structure which inherently necessary for Z.G. to learn. (Transcript p. 112-113) Due to Z.G.'s bipolar disorder and ADHD, an over-stimulated environment would be detrimental to her. Dalton's significantly smaller class size enables Z.G. to receive the individualized attention she requires. (Transcript p. 29) A larger classroom would foreclose any real opportunity to learn.

Finally, and unique to Z.G educational needs, is that she requires an academically rigorous program. Dr. Austin and Ms. Terpening both opined that Z.G.'s hyper focusing/hypomania require that Z.G.'s mind be fully engaged throughout the school day. Most of her classes at Dalton are taught higher than grade level, thus, Z.G. is able to engage her mind in such a way as to prevent decompensation. (transcript 162)

As IHO succinctly put, it is clear that Dalton has developed a thoughtful and flexible approach in providing an appropriate learning environment for Z.G. (IHO Exhibit 1, page 8 of IHO finding of Facts and Decision)

### h.    Equitable Considerations Support the Parents

Equitable considerations support the parents. Z.G.'s parents fully cooperated with the CSE/IEP process. They referred their daughter for evaluation, provided a social history, independent evaluations, and attended the CSE meeting. Furthermore, the parents enrolled and paid for their daughter to attend Dalton for two years without seeking

reimbursement. This indicates that the parents enrolled their daughter in good faith and out of a legitimate concern for her well-being.  (SRO Exhibit 1, See page 9 of the IHO decision)

## CONCLUSION

For the foregoing reasons, Plaintiff C.B. on Behalf of Z.G., respectfully requests that this Court grant plaintiff's summary judgment in all respects, that the determination of the SRO be vacated, and that the Court find that the DOE had failed to offer a free and appropriate education to Z.G.  Plaintiff C.B. on behalf of Z.G. also respectfully requests that the Court find that Dalton was an appropriate placement, that equitable factors support an award of tuition reimbursement and that C.B. on behalf of  Z.G. be awarded tuition reimbursement for her attendance for the 2005-2006 school year together with costs, a reasonable attorney fee, and disbursements and for such other relief as the Court deems just and appropriate.

Dated:  New York, New York
        September 25, 2007

Respectfully submitted,

s/Neal H. Rosenberg, Esq.
NEAL H. ROSENBERG (NHR)
Attorney for Plaintiff
9 Murray Street, Suite 4W
New York, N.Y. 10007
(212)  732-9450

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Plaintiff's Memorandum of Law in Support of Her Motion for Summary Judgment** was served via EC Filing system to Michael A. Cardozo, Corporation Counsel of the City of New York, Attorney for the Plaintiff, 100 Church Street, Room 2-121, New York, New York 10007, by Andrew J. Rauchberg (AR 2179), Assistant Corporation Counsel.

s/Stewart L. Karlin