UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In the Matter of the Application of C.B. on
Behalf of Z.G., her minor child          07 Civ. 3419 (AKH)


                              Plaintiff,

        -against-

DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK,

                              Defendant.

--------------------------------------------------------X

## PLAINTIFF'S STATEMENT OF UNCONTESTED FACTS PURSUNT TO LOCAL RULE 56.1

Pursuant to Rule 56.1 of the Civil Rules of this Court, Plaintiff C.B. on behalf of Z.G., her minor child, by their attorney, Neal Howard Rosenberg, submits her statement of material facts as to which there is no genuine issue to be tried:

1. Z.G. attended a gifted program at P.S. 166 from kindergarten through third grade. She had qualified for the program based on her performance on a standardized test. (Transcript p.80)

2. Although she received good grades on her report card in third grade, (2003-04 school year), Z.G.'s behavior changed. She exhibited extreme agitation, psychosis, suicidal ideation and violent behavior. (Transcript p. 80-81)

3. During third grade, Z.G.'s was late and absent for a total of 77 days. (Exhibit 16)

1

4. In December 2003, Z.G. was diagnosed with severe bipolar disorder with ultra-ultra rapid cycling. (Transcript p. 16, 80, and Exhibit C)

5. Z.G.'s mood could shift many times within a short period of time. Z.G. would exhibit symptoms of severe depression one minute and become manic within minutes of the depression. (Transcript p. 18)

6. Z.G.'s parents sought assistance from the school psychologist at P.S. 166, but were rebuffed. (Transcript p. 86-87)

7. The parents were not informed by DOE that it provided special services to children who are classified as handicapped based on their special needs. (Transcript p. 90-93)

8. Subsequently, Z.G. received a co-morbid diagnosis of Attention Deficit Hyperactivity Disorder (ADHD). (Exhibit "B")

9. In order to stabilize Z.G.'s moods and alleviate the symptoms of the mental illness, Dr. Gibanni Faedda, Z.G.'s psychiatrist, prescribed psychoactive mediation. (Exhibit C)

10. In addition to the psychopharmacological component, Z.G. began weekly sessions with a private psychologist, Dr. Nancy Austin, which has continued to date. (Transcript p. 14) (Exhibit C)

11. In May 2003, Dr. Faedda strongly recommended (insisted) that Z.G. attend a private school, or in the alternative, that she be home schooled. (Transcript, p. 88)

12. Dr. Faedda also recommended smaller classes, an increase in one-on-one teaching, greater flexibility with academic activities and increased support

when her symptoms interfere with school functioning. (Exhibit "C") (Transcript p. 88, 90-92)

13. The parents embarked on a search to find an appropriate school that could provide the necessary support and intervention. (Transcript p. 89)

14. In September 2004, the parents enrolled Z.G. at the Dalton School.

15. During October 2005, while a fourth-grade-student at Dalton, Z.G.'s parents referred their daughter to the CSE of Region 9 shortly after they learned that the DOE has an obligation to provide a free and appropriate education to students with disabilities.

16. On January 23, 2006, the CSE convened to discuss Z.G.'s educational program. Present at the meeting were Z.G.'s mother, Dr. Austin, Ms. Terpening (Z.G.'s teacher), and CSE representatives. (Exhibit 11)

17. The parents provided the CSE Committee with several reports including reports by Dr. Janet Jackson, an independent evaluator and Dr. Faedda, Z.G.'s treating psychiatrist. (Exhibits B and C)

18. Dr. Jackson concurred with Dr. Faedda to wit: Zoe should continue to be supported by the very effective psychiatric and psychological team that her parents have created for her. (Exhibit "C")

19. Because of her vulnerability emotionally and socially, an appropriate school setting must provide consistent medical support (presently available through the nursing staff at her school), consistent psychological support in the school, small class size, experienced teachers and a highly orderly environment. (Exhibit "C")

3

20. Because of relatively slower visual processing and issues with attention, Z.G. needs extended time on standardized tests. She also needs to take tests in a quiet environment to mitigate anxiety and distractibility. (Exhibit "C")

21. All of Z.G.'s representatives opined that Z.G. should be classified as handicapped and receive special educational services. (Exhibits B and C) (Transcript p. 29, 30, 48, 49, 50-52, 69, 107-08, 171-6, 348)

22. Z.G.'s doctors and teacher had extensive experience with Z.G. (Exhibit C) (Transcript p. 14,, 16, 154-55, 161)

24. Despite a profound mental illness, (bipolar) the CSE refused to classify Z.G. as handicapped and recommended a general education program without any special services, support services or interventions by DOE. (Exhibit 11)

25. Dalton created an individualized and comprehensive support system that would insure that Z.G.'s academic's needs would be met. (Transcript p. 157-161, 165-67, 170)

26. As a small school with only 100 students per grade, Dalton is flexible and tailors interventions and support to ensure that Z.G.'s needs were met. (Transcript p. 157-161, 165-67, 170)

27. For example, Z.G.'s fourth grade teacher moved up to fifth grade with Z.G. because the Dalton recognized the additional stress that Z.G. would experience when she changed school buildings and thus eliminated the additional stressor. (Transcript p. 161)

28. Dalton provided an educational consultant with special educational training to observe Z.G. three times each week. Based on her observations of Z.G. and

her expertise, the educational consultant regularly conferred with Z.G.'s teacher, Ms. Terpening, to devise teaching strategies to meet Z.G.'s unique educational needs. (Transcript p. 160-61, 166)

29. Ms. Terpening regularly consulted with Z.G's other teachers, psychologist, and parents to ensure that the interventions continue and that any problems that surfaced were dealt with immediately. (Transcript p. 158, 160-161)

30. Ms. Terpening provided extensive redirection, and one to one emotional and academic support. (Transcript p. 158, 160-61)

31. Dalton provided a full-time on-site psychologist who is available to meet with Z.G. as needed. (Transcript p. 158)

32. Dalton also employed a full-time nurse that monitored the side effects of Z.G.'s medication. (Transcript p. 158)

33. The nurse's office was utilized as a place for Z.G. to decompress when the symptoms of her mental illness become overwhelming. (Transcript p. 192)

34. Small class size is essential to Z.G.'s educational progress. (Exhibit B and C) (Transcript p. 29, 174)

35. Dalton average class size is 19 children per class with many specialty classes being much smaller. (Transcript p. 161)

36. According to the New York Department of Information, average classes in Z.G.'s home school district have 25.2 students in 5th grade and 35.4 students in 6th grade.

37. Z.G.'s ability to hyper-focus on challenging and engaging material actually prevents psychiatric decompensation. (Transcript p. 26-29)

38. Dalton offers an accelerated academic program that meets Z.G.'s high academic abilities which in turn ameliorates the symptoms of bipolar disorder. (Transcript p. 174-76)

39. Bipolar is a neurobiologically based disorder in which the neurobiological system is deregulated. This means sleep, attention, mood, emotions, self esteem are all irregular and the system does not have the natural means to re-regulate itself. (Transcript p. 17)

40. A child and adolescent suffering from bipolar illness manifest it by having period of mania and depression. (Transcript p. 17)

41. Z.G. has symptoms of ADHD, non attentive type that manifest itself through a lack of focus, and a difficulty sitting still. (Transcript p. 17)

42. Z.G. has a very severe case of bipolar disorder because she has ultra, ultra rapid cycling and also has symptoms of a mixed state. Ultra, ultra rapid cycling means that Z.G.'s mood can swing from moment to moment and because she is in a mixed state she can also be suffering from very depressive thoughts. (Transcript p. 18-20)

43. Bipolar disorder affects Z.G.'s ability to process new visual and verbal information. (Transcript p. 25)

44. In periods of mania, Z.G. gets overactive and cannot regulate her thoughts. This is commonly referred to as racing thoughts. Other symptoms which Z.G. suffers from are anger which can be difficult to control, poor sleep and extreme anxiousness. (Transcript p. 17,23)

45. Racing thoughts compete with Z.G.'s ability to focus and depression may make

it difficult for her to get motivated. (Transcript p. 26)

46. Despite being gifted in many areas, Z.G. remains fragile and needs small classrooms, positive reinforcement, one on one support as much as practical, an opportunity for breaks, a place where she can decompress when her symptoms take over enabling her to refocus, extra time in a quiet setting for testing and access to a school psychologist at any time during school hours. (Transcript p. 29, 48-51)

47. If the program is not challenging enough for Z.G., she will lose the ability to focus, she becomes anxious and the manic symptoms will begin to take over. (Transcript p. 52, 89)

48. In public school, Z.G.'s symptoms of bipolar deteriorated. Z.G. was experiencing problems with sleeping, tantrums, anxiety, obsessions and oppositional behavior. (Transcript p. 69) She was extremely agitated. She was in constant rages, suicidal ideation, hypo manic episodes, talking nonstop, weeping and laughing interchangeably. (Transcript p. 80-81)

49. Z.G. was anxious and terrified to go to public school. She was disorganized, and did not know what was going on. (Transcript p. 82)

50. Since Z.G. has enrolled at Dalton, she has stabilized. (Transcript p. 108)

51. Dalton is academically appropriate, with a tremendous amount of one on one support, an open door to counseling anytime with the school psychologist, a learning specialist that attends class three times a week to offer teaching strategies, and the nurse's office to let her decompress when her symptoms manifest itself. (Transcript p. 113-114, 122-23, 156-57)

52. There were times at Dalton, that Z.G. was very depressed, upset and crying and could not calm down. She would go to the school psychologist or visit the school nurse to regain her composure. (Transcript p. 157)

53. There were times at Dalton that Z.G. became manic by exhibiting a fast speech pattern, going off on tangents, and having outbursts. During these episodes, Z.G. received structure and support from her school to manage her emotions. (Transcript p. 158)

54. Z.G.'s teacher is in constant communication with her parents, her psychologist, Dr. Austin as well as the school psychologist and school nurse. (Transcript p. 160) Her teacher spends about one hour a day in direct communication with Z.G. and her parents. She believes it is critical in treating Z.G. that everyone is involved. (Transcript p. 160-61)

55. Ms. Terpening believes that Z.G. has flourished at Dalton and produced brilliant work but would not have been able to do so without the support system in place. (Transcript p. 167).

56. According to Ms. Terpening, Z.G. should not be placed in a New York City Public School without any support. She stated that it is "difficult to imagine", she would "suffer on every level", and her social and emotional well being would be at a very dangerous level. (Transcript p. 174)

57. According to Ms. Terpening, Z.G. needs small classroom, someone to check on her daily maintenance, organization, and assignments, a rigorous curriculum or she will zone out and not engage, nurse accessibility, school psychologist accessibility, and a teacher support system. (Transcript p. 174-76)

58. According to Ms. Terpening, while teaching Z.G., she needs to directly intervene two or three times a day. (Transcript p. 188)

Dated: New York, New York
       September 20, 2007

Respectfully submitted,

_____
NEAL H. ROSENBERG (NHR 7827)
Attorney for Plaintiff
9 Murray Street, Suite 4 West
New York, New York 10007
(212) 732-9450

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Plaintiff's Statement of Uncontested Facts Pursuant to Local Rule 56.1** was served via EC Filing system to Michael A. Cardozo, Corporation Counsel of the City of New York, Attorney for the Plaintiff, 100 Church Street, Room 2-121, New York, New York 10007, by Andrew J. Rauchberg (AR 2179), Assistant Corporation Counsel.

s/Stewart L. Karlin