UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

In the Matter of the Application of C.B. on
Behalf of Z.G., her minor child            07 Civ. 3419 (AKH)

                                     Plaintiff,

      -against-

DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK,

                                     Defendant.

------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO NYC DEPT. OF EDUCATION'S MOTION FOR SUMMARY JUDGMENT**

**1.**      **Preliminary Statement**

The Plaintiff submits this memorandum of law in opposition to defendant Department of Education of the City of New York's motion for summary judgment.

**2.**      **Factual Statement**

The Court is respectfully referred to Plaintiff's Factual Statement contained in her Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment and Plaintiff's Statement of Undisputed Facts Pursuant to Local Rule 56.1. for the pertinent facts concerning the case at bar.

**RESPONSIVE ARGUMENT**

1. **A De Novo Review is Required and the Court Should Give Great Weight to the Impartial Hearing Officer's Decision Where His Decision is Based on the Assessment of the Evidence Presented and the Credibility of the Witnesses, and Where the Decision of the SRO is Not Supported by the Evidence, is Unreasonable, is Biased, is Contrary to New York State Law and When NYC Regulations Mandate that the SRO Decision Be Given No Weight.**

    a. **New York State Regulation Mandate That SRO Decision Be Given No Weight**

At the outset, New York State regulations pertaining to the impact of the SRO decision requires that the decision not constitute binding precedent whatsoever. 8 N.Y.C.R.R. § 279.12. Section 279.12 states:

> Section 279.12 Decision of State Review Officer.
>
> (a) The decision of the State Review Officer shall be based solely upon the record before the State Review Officer and shall be final, unless an aggrieved party seeks judicial review. The decision of the State Review Officer shall be binding upon the parties and the State Education Department with respect to the provision of special education to the student with a disability involved, **but shall not constitute binding precedent in any judicial action or proceeding or administrative appeal in any forum whatsoever. (Emphasis supplied)**

New York State law requires the SRO decision *not* be given any precedent value "whatsoever," Thus, New York State law requires that no weight be given to the decision. To give the SRO decision some weight, would in turn give the SRO decision some precedent value, and would thus be contrary to the plain language of "whatsoever" language set forth in its own regulations. As a result, the Court should give due weight to the IHO decision only.

    b. **A De Novo Review is Required and the Court Should**

> **Give Great Weight to the Impartial Hearing Officer's Decision Where His Decision is Based on the Assessment of the Evidence Presented and the Credibility of the Witnesses, and Where the Decision of the SRO is Not Supported by the Evidence, is Unreasonable, is Biased, and is Contrary to New York State Law**

Under IDEA, the Court must conduct a *de novo* review of IDEA administrative decision. *See Walker County School District v. Bennett* 203 F.3d 1293 (11th Cir. 2000) *cert. denied* 531 U.S. 1059 (2000); In fact, Section 1415 (i) (2) (B) states that " in any action brought under this paragraph, the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. Thus, the Court should receive the entire record of the proceeding in order to be able to conduct a *de novo review.*

*Board of Education v. Rowley,* 457 U.S. 176, 206 (1982) requires that due weight be given to the administrative proceedings. Language that would have state administrative evidence, the Conference Committee explained that courts were to make independent decisions based on a preponderance of the evidence" citing S. Conf. Rep No. 94-455, p.50 (1975), U.S. Code Cong. & Admin. News 1975, p.1503. See also 121 Cong. Record 37416 (1975) (remarks of Sen. Williams). Rowley supra at 205

In *Walczak v. Florida Union Free Sch. District,* 142 F.3d 119, 129 (2nd Cir. 1998, the Second Circuit held that federal courts do not simply rubberstamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy. *Walczak supra* at 129. Since the

New York State Regulations state that the SRO is entitled no precedential value whatsoever, the Court should look to the IHO decision.

The IHO held that Z.G.'s severe bipolar disorder impacted on her education and thus she should be classified as Other Health Impaired and entitled to support services.

Even without the New York State regulations mandating that the SRO decision be given no precedential value whatsoever, the Court should defer to the initial decision maker when his findings are based upon credibility determinations, unless the non-testimonial extrinsic evidence, or the record considered in its entirety would justify a contrary decision. *O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233,* 144 F.3d 692, 698-99 (10th Cir. 1998) citing *Carlisle Area Sch. V. Scott P.,* 62 F.3d 520, 529 (3rd Cir. 1995). *But cf. Karl v. Board of Education of Geneseo C. Sch. Dist.*, 736 F.2d 873, 877 (2nd Cir. 1984) reversing a District Court decision regarding student-teacher ratios held appropriate by the Commissioner, the Second Circuit held that deference is due the decision of the final decision maker "where such deference is otherwise appropriate."  If the conclusion of the state review officer, or the impartial hearing officer is unsupported by the record as a whole and incorrect as a matter of law, they simply do not merit deference. *Mr. X v. N.Y.S. Educ. Dep't,* 975 F. Supp. 546 (S.D. N.Y. 1997) citing *Evans v. Bd. Of Educ. Of Rhinebeck Central Sch Dist.,* 930 F. Supp. 83 at 102 (S.D.N.Y. 2003) rejecting the suggestion that deference is due to the SRO decision in the presence of a well-reasoned decision from the IHO and a SRO decision that failed to address the substantive appropriateness of the IEP.

The IHO's decision was based upon the documents and testimony presented with determinations of credibility as to each of the witnesses.  As explained below, the decision

of the SRO was not supported by the weight of the evidence, lacks rationality and quite frankly lacks common sense. The SRO decision that a child who is suffering from the most severe case of bipolar disorder with ultra ultra rapid cycling co morbid with ADHD somehow would not impact Z.G.'s processing of information required in an educational setting is plainly wrong and not rationally based.

IHO Stern found that DOE did not offer Z.G. a free and appropriate education. However, SRO Paul Kelly overturned the decision of IHO Stern holding that a child suffering from a profound case of bipolar disorder co morbid with ADHD is not educationally handicapped. Thus, Z.G. was not entitled to any support services, and Z.G. was assigned to general education.

SRO decisions have uniformly favored the District. Between 2006 and March 2007, only five of forty-three cases to which the IHO ruled in favor of the parents were upheld on appeal when the School District appealed. Thirty-seven out of thirty-nine consecutive case favored the School District completely. SRO Kelly manages the office is responsible. His management has led to a number of attorneys resigning in protest since the office is not following the law. (See Sun Article attached to memorandum as Exhibit "A").

Here, the SRO decision is fundamentally inconsistent. It is uncontroverted that Z.G. is suffering from bipolar disorder. On one breath, the SRO concluded that Z.G.'s bipolar does not impact on her education. On another breath, the SRO concluded that Dalton is not appropriate because any public school could provide all the essential structure and support including but not limited to refocusing, counseling, coordinated educational interventions and monitoring medication side effects. Thus, the SRO directly

contradicts the holding of his own decision by acknowledging that special education and support services are necessary in order for Z.G. to access her education. (See page 7 of the SRO decision)

Thus, the SRO decision is not entitled to any weight and the IHO decision should be given weight in the Court's deliberation.

**2.    DOE Has Attempted to Cast the Argument as to Why Should DOE Have to Pay for an Elitist Upscale Private School.  This Prevailing Attitude by DOE Resulted in a Predetermination Not to Classify Z.G. Educationally Handicapped as Evidenced by the Fact that it Failed to Involve the Parents, Teacher and Her Doctors in the Creation of the IEP. The Predetermination of an IEP and the Failure to Involve the Parents, Teacher and Doctors Makes the IEP Fatally Defective.**

The Defendant has repeatedly attempted to characterize the debate as to why should we have to pay parents to send their child to an elitist upscale school. (See paragraph 7 of Defendant's Statement of Uncontested Facts)  Of course, the answer is that the New York City Department of Education refused to acknowledge that a child suffering from the most severe case of bipolar disorder with rapid rapid cycling, and ADHD impacts the way she processes information.  Despite her intelligence, special educational support services are necessary for her to succeed.  The Defendant could have simply agreed to classify her eligible and just provide the support services to her as they do to countless other students.

Instead, the New York City Department of Education has repeatedly attempted to paint this into a type of class warfare losing sight of the special needs of this child. The CSE team predetermined the outcome of the IEP solely based on Z.G. going to Dalton and using her test scores and grades at Dalton to justify their non-handicap designation.  The testimony reflects that despite their presence at the CSE meeting, the parents, along with

6

any person advocating on behalf of Z.G., were not afforded a meaningful opportunity to participate in the creation of the IEP. This is because the DOE members relying on Z.G.'s test scores and grades were not going to designate Z.G. educationally handicapped under any circumstances. The DOE members were not interested in the significant educational interventions by Dalton and her parents that were necessary in order to have Z.G. succeed academically. They were not interested in any input from the mother, Z.G's doctors and teacher because the DOE members had predetermined the outcome of the IEP. This procedural violation is substantial and is a denial of FAPE. Therefore, the IEP is procedurally invalid and should be nullified. *Application of a Child with a Disability*, Appeal No. 05-087 (internal citations admitted); Also, see 8 NYCRR 200.5. When the procedural violation is significant, it causes a denial of FAPE. *Application of a Child with a Disability*, Appeal No. 05-087.

### 3. Z.G. Met the Criteria for OHI When it was Uncontroverted that Z.G. was Suffering From Severe Bipolar Disorder With Ultra Ultra Rapid Cycling Co Morbid with ADHD

Z.G. meets the criteria for "other health-impairment" which is defined as:

> having limited strength, vitality or alertness including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems, including but not limited to a heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, diabetes, attention deficit disorder or attention deficit hyperactivity disorder or tourette syndrome, which adversely affects a student's educational performance. 8 NYCRR §200.1 (zz) (10)

This list of qualifying conditions is not exhaustive. See *Application of a Child*

*Suspected of Having a Disability* Appeal No. 02-048; rather it requires that the DOE investigate whether a medical condition "adversely affects a student's performance." In addition, Z.G.'s secondary diagnosis is ADHD which is specifically included in the list of handicapping condition that qualify as other health impaired.

Bipolar Disorder is a neurobiologically based disorder in which the neurobiological system is deregulated. This means sleep, attention, mood, emotions, self esteem is all irregular and the system does not have the natural means to re-regulate itself. (Transcript p. 17) A child and adolescent suffering from bipolar illness manifest the illness by having period of mania and depression. (Transcript p. 17) Symptoms, which Z.G. suffers from, is anger, which can be difficult to control, poor sleep and extreme anxiousness. (Transcript p. 17,23) Also, Z.G. received a co-morbid diagnosis of Attention Deficit Hyperactivity Disorder (ADHD). (Exhibit "B") Z.G. also has symptoms of ADHD, non attentive type that manifest themselves through a lack of focus, and a difficulty sitting still. (Transcript p. 17)

It is inconceivable that Z.G. with a very severe case of bipolar disorder including ultra, rapid rapid cycling and ADHD would not impact the processing of information which in turn would impact her education. (Transcript p. 18-20) Bipolar disorder impacts Z.G.'s ability to process new visual and verbal information. (Transcript p. 25) For example, racing thoughts compete with Z.G.'s ability to focus and depression may make it difficult for her to get motivated. (Transcript p. 26) Z.G.'s mood shifts many times within a short period of time. Z.G. would exhibit symptoms of severe depression one minute and become manic within minutes of the depression. (Transcript p. 18)

Z.G.'s treating psychologist and her teacher confirmed the impact of Z.G.'s illness on her education. Dr. Austin testified in relevant part:

> "Well, the symptoms of bipolar disorder affect attention, affect activity level, affect the ability of one's sense of oneself, one's self esteem. Motivation to initiate, lower if one is depressed and slowed down, one doesn't initiate. There's a lot of anxiety that comes with not being able to do what is asked.
>
> And then when on the other end of the schema-in when one is too activated, the mind works too hard and there is difficulty consistently with bipolar kids in the ability to follow-with executive skills, to organize and follow through on tasks. There's difficulty with working memory. There's difficulty with processing speed and with Z.G. in particular the visual scanning and processing is quite problematic. But the auditory processing is also difficult.
>
> These things wax and wane depending on the symptoms, and with Z.G. these things wax and wane depending on the symptoms and her range of symptoms is particularly wide and severe for all-compare to all the bipolar kids. She has a very wide range and severity of symptoms. (Transcript p. 62-63).

Ms, Terpening (teacher) also confirms that Z.G.'s illness substantially impacted her education.

> She definitely exhibits bipolar behavior in that there are days where she will be extremely depressed and very upset. It can come on very quickly where she will seem-appear fine and then begin crying because something's upset her. It take a lot to calm her sown and sometimes I'm unable to calm her down. She needs to actually go down and speak with our school psychologist or go down and visit the school nurse.
>
> Other times she will be very high. She speaks very quickly. She has a hard time controlling her outbursts. She'll call out during class. Sometimes she'll go off on tangents and so she needs a lot of structure in terms of helping her to manage those different emotions when they come up, especially in the contest of a structured classroom. (transcript p. 158-159)

Ms. Terpening's testimony was equally compelling regarding the necessity for extensive support services for Z.G. . It is axiomatic that a trial judge or in this case, an

9

Independent Hearing Officer is in a unique position to assess the credibility of witnesses. Assessment and resolution of conflicting evidence and witness credibility are within the province of an administrative fact finder. *McKinney v. Bennett,* 2006 N.Y. Slip Op. 05274 9 N.Y. App.Div. 3 Dept., 2006.   The decision of a hearing officer to credit the testimony of witnesses is largely unreviewable by the courts, which are disadvantaged in such matters because their review is confined to a lifeless record. *Crimmins v. Dennison,* 815 N.Y.S.2d 400  (2006)

 The IHO Findings of Fact and Decision found (page 7) that Z.G.'s teacher for the past two years provided credible testimony that her disorder negatively impacted upon her educational performance should have been binding on the SRO and should be binding on this Court because it is well supported in the administrative record.

 IHO Stern reasonably found that Ms. Terpening (who was Z.G.'s teacher for two consecutive years) was the ***best*** person situated to observe Z.G. in her academic environment and  determine the impact of her bipolar disorder, and ADHD on a student's performance.  This factual and credibility determination is well supported in the administrative record since Ms. Terpening being Z.G.'s teacher for two years was in fact in the best position to observe Z.G. in an academic setting.

 Ms. Terpening believes that Z.G. has flourished at Dalton and produced brilliant work but would not have been able to do so without the extensive support system in place. (Transcript p. 167).   Ms. Terpening also testified that Z.G. should not be placed in a New York City Public School without any support.  She stated that it is "difficult to imagine",

she would "suffer on every level", and her social and emotional well being would be at a very dangerous level. (Transcript p. 174)

According to Ms. Terpening, Z.G. needs small classrooms, someone to check on her daily maintenance, organization, and assignments, a rigorous curriculum or she will zone out and not engage. She needs nurse accessibility, school psychologist accessibility, and a teacher support system. (Transcript p. 174-76) According to Ms. Terpening, she needs to intervene two or three times a day to keep her on track. (Transcript p. 188) IHO Stern's finding that Ms. Terpening's testimony was credible, competent and well founded is supported by the fact that she was in fact the best person situated to observe Z.G. SRO not accepting Ms. Terpening's testimony is a clear error.

Dr. Austin echoing the opinion of Dr. Faedda stated that Z.G. needed a small classroom. She needs increased one on one support (Transcript p. 29, 48) She requires extra time for taking tests in a quiet room. (Transcript p. 49) She needs a place for breaks to allow her opportunity to refocus. (Transcript p. 49)

In sum, the IEP casts Z.G. into the general education program without any support services does not provide Z.G. with FAPE.

    **4.**    **The Services Z.G. Received Were Special Education and Related Services.**

The federal and state regulations make it abundantly clear that Z.G. was receiving both special education and related services. 34 C.F.R. § 300.26 states as follows:

> Sec. 300.26 Special education. (a) General. (1) As used in this part, the term special education means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including-- (i)

11

>  Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings;
>
>  (3) Specially-designed instruction means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction

The federal and state regulations define related services as follow at 34 C.F.R.324 as follows:

>  Sec. 300.24 Related services. (a) General. As used in this part, the term related services means transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education, and includes speech-language pathology and audiology services, **psychological services**, physical and occupational therapy, recreation, including therapeutic recreation, early identification and assessment of disabilities in children, **counseling services**, including rehabilitation counseling, orientation and mobility services, and medical services for diagnostic or evaluation purposes. The term also includes **school health services**, social work services in schools, and **parent counseling and training**. (emphasis supplied)

New York State Regulations define related services as follows at 8 NYCRR § 20.1 (qq):

>  Related services means developmental, corrective, and other supportive services as are required to assist a student with a disability and includes speech-language pathology, audiology services, interpreting services, **psychological services**, physical therapy, occupational therapy, **counseling services**, including rehabilitation counseling services, orientation and mobility services, medical services as defined in this section, **parent counseling and training, school health services**, school social work, assistive technology services, appropriate access to recreation, including therapeutic recreation, other appropriate developmental or corrective support services, and other appropriate support services and includes the early identification and assessment of disabling conditions in students. (emphasis supplied)

Thus, it is clear that Z.G. was receiving special education through specialized instruction specifically designed to address her disabilities. The teacher testified at length the significant involvement (about an hour a day for Z.G. alone, frequently employing one to one teaching strategies, being in constant communication with the school psychologist, Z.G.'s psychologist, and the parents; Also see Section 5 infra;) and teaching strategies utilized at the suggestion of an observing special education teacher. Nor can there be a dispute that she is receiving psychological services, school health services, parent counseling and training which are clearly related services as set forth by the federal and state regulations.

DOE argues that schools have psychologist and nurses and that much of the intervention strategies employed with Z.G. can be done without necessity of an IEP.

This argument rings hollow and misleads the Court (as it misled the SRO) or in the alternative, reflects a fundamental lack of knowledge regarding education law.

Without an IEP in place designating Z.G. "Other Health Impaired" and setting forth the services that are to be provided, the DOE is under no legal obligation to provide any services at all to Z.G. If the school Z.G. attends does not have a psychologist, or a nurse and the teacher does not employ any intervention strategies, there is no recourse for Z.G. since the DOE is under no legal obligation to provide any intervention and learning strategies at all. Put simply, Z.G. has no legal recourse since the DOE was not legally obligated to do anything.

Further, without an IEP in place, there are no objectives and goals set, there are no regular updates to measure Z.G.'s progress, there are no conferences to take measure of how the intervention strategies are working and whether the strategies have to be adjusted.

Of course without knowing what school Z.G. was going to attend, it is speculation as to whether any intervention strategies could be employed at all. The SRO gave credibility to the DOE representatives that any teacher at any public school would provide the same structure to Z.G. that Dalton provides. However, not all schools have psychologists and nurses, depending on the size of the school. (Transcript p. 252) Moreover, the DOE could not provide a special education teacher to offer teaching strategies regarding Z.G. Further, the assertion that a public school teacher who probably has between one hundred and two hundred students, would spend an hour every day with one student, frequently employing one to one teaching strategies, being in constant communication with the school psychologist, Z.G.'s psychologist, the parents and the nurse stretches credibility to the breaking point. Finally, without testimony from representatives of the school (teacher, nurse and school psychologist) that Z.G. would be attending, it is speculation piled on speculation as to whether these services could be provided even though the defendant would be under no legal obligation to do so.

5.  **The Placement at Dalton was Appropriate**

IHO Stern succinctly summarized the reasons why the placement at Dalton was appropriate. Z.G. is making significant academic progress. Credible testimony established that Z.G. needs a structured school with an individualized program, and a comprehensive system of interventions within the school-in addition to medication and outside therapy to ensure academic progress. Ms. Terpening testified that all the interventions were essential for Z.G. to achieve any academic success. (transcript p. 171) Her opinion was consistent with Dr. Austin and Dr. Faedda. (Exhibit C and transcript 27) With only 100 students per grade, Dalton is able to respond to Z.G.'s unique educational needs. For instance, Dalton

recognized that because of Z.G.'s disorder, transitions were particularly stressful for her. In order to provide essential stability and structure, Dalton placed Z.G. with Ms. Terpening in 5th grade because as Z.G.'s 4th grade teacher, she had become well acquainted with Z.G.'s educational and psychological needs. (transcript 164) Ms. Terpening also provides one-to-one interventions as needed and on a regular basis, (transcript p. 160, 165), spending an average of one hour each day meeting with Z.G. and consulting with either Z.G.'s parents, her psychologist or other school professionals. (transcript 161). A learning specialist, with special education training observes the class three days per week. (transcript p 181, 194) Based on Z.G.'s educational needs, the special education consultant develops specific strategies to assist Z.G. and consults with Ms. Terpening so that she can help implement these strategies. Ms. Terpening also consults and coordinates with Z.G.'s other teachers, psychiatrist, psychologist, and her mother. (Transcript p. 159, 166, 170-171, 182-183), 188). The school also provides a full-time psychologist onsite that Z.G. periodically meets with to help her manage the symptoms of her illness. The presence of a full-time nurse is crucial to help monitor the potential side effects of her medication. The nurse's office also has been utilized to help Z.G. decompress when her anxiety becomes overwhelming.

  Dalton itself provides a level of structure which is inherently necessary for Z.G. to learn. (Transcript p. 112-113) Due to Z.G.'s bipolar disorder and ADHD, an over-stimulated environment would be detrimental to her. Dalton's significantly smaller class size enables Z.G. to receive the individualized attention she requires. (Transcript p. 29) A larger classroom would foreclose any real opportunity to learn.

Finally, and unique to Z.G educational needs, is that she requires an academically rigorous program. Dr. Austin and Ms. Terpening both opined that Z.G.'s hyper focusing/hypo mania requires that Z.G.'s mind be fully engaged throughout the school day. Most of her classes at Dalton are taught higher than grade level, thus, Z.G. is able to engage her mind in such a way as to prevent de compensation. (transcript 162)

Z.G. is suffering from severe bipolar disorder with ultra ultra rapid cycling, and ADHD. The only reason that Z.G. has been able to thrive at Dalton is that she was provided a small structured setting, individualized instruction and comprehensive support system with onsite counseling and monitoring. Her intelligence should not overshadow the fact that she needs these services in order to be successful and without these services in place there is a substantial risk of regression. As Ms. Terpening succinctly put, that Z.G. should not be placed in a New York City Public School **without any support** . . . it is "difficult to imagine", she would "suffer on every level", and her social and emotional well being would be at a very dangerous level. (Transcript p. 174)

As IHO succinctly put, it is clear that Dalton has developed a thoughtful and flexible approach in providing an appropriate learning environment for Z.G. (IHO Exhibit 1, page 8 of IHO finding of Facts and Decision)

### 6.  **Equitable Considerations Support the Parents**

Equitable considerations support the parents. The defendant claims that the parents had no intention to find a public school program but were trying to obtain reimbursement only for Dalton.

This allegation is categorically denied. Z.G.'s parents fully cooperated with the CSE/IEP process. They referred their daughter for evaluation, provided a social history,

independent evaluations, and attended the CSE meeting. Furthermore, the parents enrolled and paid for their daughter to attend Dalton for two years without seeking reimbursement. This indicates that the parents enrolled their daughter in good faith and out of a legitimate concern for her well-being. (SRO Exhibit 1, See page 9 of the IHO decision) They could have but did not seek reimbursement for the prior years as well. Further, the School District simply could have found Z.G. eligible and delivered support services as the defendant has done with countless other students. It is only because Z.G. was attending Dalton, and the defendant viewed Dalton as an upscale and elitist school that the defendant refuses to acknowledge Z.G's. profound disability of bipolar disorder with rapid rapid cycling (the most severe kind) and ADHD.

Put simply, the NYC Department of Education let the fact that this child was attending Dalton warp its thinking by not recognizing an obvious medical condition which impacts the way Z.G. processes information which in turn requires special education and support services.

Accordingly, all three of the Burlington/Carter factors should be decided in favor of Z.G. and Z.G.'Motion for Summary Judgment should be granted in its entirety and DOE's summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff C.B. on Behalf of Z.G., respectfully requests that this Court grant Plaintiff's Motion for Summary Judgment in its entirety and deny defendant's summary judgment in all respects, and for such other relief as the Court deems just and appropriate.

Dated:  New York, New York
       November 2, 2007

                                              Respectfully submitted,

                                              s/Neal H. Rosenberg, Esq.
                                              NEAL H. ROSENBERG (NR 7827)
                                              Attorney for Plaintiff
                                              9 Murray Street, Suite 4W
                                              New York, N.Y. 10007
                                              (212)  732-9450

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment was served via EC Filing system to Michael A. Cardozo, Corporation Counsel of the City of New York, Attorney for the Plaintiff, 100 Church Street, Room 2-121, New York, New York 10007, by Andrew J. Rauchberg (AR 2179), Assistant Corporation Counsel on this 2nd of November, 2007.

s/Neal Howard Rosenberg