UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

In the Matter of the Application of C.B. on
Behalf of Z.G., her minor child                    07 Civ. 3419 (AKH)


                                      Plaintiff,

    -against-

DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK,

                                      Defendant.

------------------------------------------------------X


**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

**1.    Preliminary Statement**

The plaintiff submits this reply memorandum of law in further support of her

motion for summary judgment.

**RESPONSIVE ARGUMENT**

**2.    The DOE's Strained Interpretation of the New York State Regulation
Ignores the Plain Language of the Regulation.**

The regulation clearly states that the SRO decision shall not constitute binding

precedent whatsoever. 8 N.Y.C.R.R. § 279.12.  Section 279.12 states:

> Section 279.12 Decision of State Review Officer.
>
> (a) The decision of the State Review Officer shall be based solely upon the record before the State Review Officer and shall be final, unless an aggrieved party seeks judicial review. The decision of the State Review Officer shall be binding upon the parties and the State Education Department with respect to the provision of special education to the

student with a disability involved, **but shall not constitute binding precedent in any judicial action or proceeding or administrative appeal in any forum whatsoever.** (Emphasis supplied)

The DOE argues that the "whatsoever" language modifies the word forum. However, that is a strained interpretation because the language just preceding forum is "any forum." Moreover, there is no other credible explanation for the meaning of the regulation and none is suggested by the DOE.

The absent of a contrary meaning to the regulation and a fair and reasonable construction of the regulation requires that decision be given no weight. Further, the plain and reasonable construction that the SRO decision "**shall not constitute binding precedent in any judicial action or proceeding or administrative appeal in any forum whatsoever**" is obvious. (Emphasis supplied)

The plain meaning of the New York State law requires that the SRO decision *not* be given any precedent value "whatsoever," Thus, New York State law requires that no weight be given to the decision. To give the SRO decision some weight, would in turn give the SRO decision some precedent value, and would thus be contrary to the plain language of "whatsoever" language set forth in its own regulations.

The cases cited by the DOE are inapplicable because the cases do not interpret this specific regulation. To plaintiff's knowledge, this argument has never been raised before in Court. The defendant relies on case law that does not apply to the case at bar because to plaintiff's knowledge the application and interpretation of this regulation is one of first impression.

### 3. Even Without the Regulation, a De Novo Review is Required and the Court Should Give Great Weight to the Impartial Hearing Officer's Decision Where His Decision is Based on the Assessment of the Evidence Presented and the Credibility of the Witnesses

Even assuming for the moment that there was no regulation requiring that the SRO decision be given no weight, the IHO decision should be given great weight since the IHO decision is based on a through review of the evidence and an assessment of credibility of the witnesses. The IHO held that Z.G.'s severe bipolar disorder impacted on her education and thus she should be classified as Other Health Impaired and entitled to support services. The SRO held that although she is suffering from bipolar disorder, her illness did not impact on her education. Thus, SRO held that the DOE determination was correct when it designated Z.G. non-handicapped and referred her to the general education program without any support services.[1]

The IHO Findings of Fact and Decision found (page 7) that Z.G.'s teacher for the past two years provided the best credible testimony concerning Z.G. since she was her teacher the preceding two years prior to the hearing. Her testimony is not contested by the DOE. The teacher (Ms. Terpening) opined that her disorder negatively impacted

---

[1] However, the Second Circuit has held that the resolution of whether a student is classified eligible for services involves the interpretation of the IDEA and the definition of 'emotional disturbance' under the applicable federal statutory interpretation, the district court is as well positioned as the state administrative officials to determine a student's eligibility. A district court is not required to give state administrative proceedings the usual 'due weight' when the administrative decision concerns an issue of law. *(citing Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1122(2nd Cir. 1997)* Thus, in this case, whether Z.G. should be classified as OHI should be decided by this Court since it is as well positioned as the state administrative official to determine a student's eligibility under the OHI designation and no weight should be given the administrative proceedings. *Muller supra* at 102 and Judge Robinson of this Court in *N.C. v. Bedford Central School District* 473 F.Supp2d 532, 542 (S.D., N.Y. 2007)

upon her educational performance should have been binding on the SRO and should be given a great deal of weight by this Court because it is well supported in the administrative record.   IHO Stern quoted Ms. Terpening to wit: "She definitely exhibits bipolar behavior in that there are days where she will be extremely depressed and very upset.  It can come on very quickly where she will seem-appear fine and then begin crying because something upset her.  It takes a lot to calm her down and sometimes I'm unable to calm her down.  She needs to actually go down and speak with our school psychologist or go down and visit the school nurse.  Other times she will be very high.  She speaks very quickly. She has a hard time controlling her outbursts.  She'll call out during class.  Sometimes she'll go off on tangents and so she needs a lot of structure in terms of helping her to manage those different emotions when they come up, especially in the context of a structured classroom (transcript p. 158-59)"   IHO Stern reasonably found that Ms. Terpening (who was Z.G.'s teacher for two consecutive years) was the *best* person situated to observe Z.G. in her academic environment and  determine the impact of any emotional disorder on a student's performance.  This factual and credibility determination is well supported in the administrative record since Ms. Terpening was in fact in the best position to observe Z.G. in an academic setting.

      Ms. Terpening believes that Z.G. has flourished at Dalton, but would not have been able to do so without the extensive support system in place.   (Transcript p. 167).  Ms. Terpening also testified that Z.G. should not be placed in a New York City Public School without any support.  She stated that it is "difficult to imagine," she would "suffer on  every level," and her social and emotional well being would be at a very dangerous level. (Transcript p. 174)

According to Ms. Terpening, Z.G. needs small classrooms, someone to check on her daily maintenance, organization, and assignments, a rigorous curriculum or she will zone out and not engage. She needs nurse accessibility, school psychologist accessibility, and a teacher support system. (Transcript p. 174-76) According to Ms. Terpening, she needs to intervene two or three times a day to keep her on track. (Transcript p. 188)

IHO Stern's finding that Ms. Terpening's testimony was credible, competent and well founded is supported by the fact that she was in fact the best person situated to observe Z.G.

The DOE argues that the SRO did not find that Ms. Terpening's testimony was not credible. However, in order for the SRO to reach his decision, he had to find by necessity that Ms. Terpening's testimony was not credible. Put simply, if he found Ms. Terpening's testimony credible, the SRO should have found that Z.G's. education was impacted by her bipolar disorder and ADHD since that was the clear and unambiguous opinion of Ms. Terpening.

It is axiomatic that a trial judge or in this case, an Independent Hearing Officer is in a unique position to assess the credibility of witnesses and the teacher (Ms. Terpening) who taught Z.G. for two years was in the best position to judge the impact of Z.G.'s bipolar disorder. Her testimony conclusively establishes the impact of Z.G.'s illness on her education.

    **4.** **The DOE Misses a Fundamental Point that Z.G. is Succeeding Only Because of the Comprehensive Intervention Strategies that are in Place (Special Education and Related Services) at Dalton and that Z.G. Would Be Adversely Impacted Without the Comprehensive Intervention Strategies in Place.**

Credible testimony that is uncontested by the DOE establishes that Z.G. needs a structured school with an individualized program, with a comprehensive system of interventions within the school-in addition to medication and outside therapy to ensure academic progress. Ms. Terpening testified that all the interventions were essential for Z.G. to achieve any academic success. (transcript p. 171) Her opinion was consistent with Dr. Austin and Dr. Faedda. (Exhibit C and transcript 27) With only 100 students per grade, Dalton is able to respond to Z.G.'s unique educational needs. For instance, Dalton recognized that because of Z.G.'s disorder, transitions were particularly stressful for her. In order to provide essential stability and structure, Dalton placed Z.G. with Ms. Terpening in 5th grade because as Z.G.'s 4th grade teacher, she had become well acquainted with Z.G.'s educational and psychological needs. (transcript 164) Ms. Terpening also provides one-to-one interventions as needed and on a regular basis, (transcript p. 160, 165), spending an average of one hour each day meeting with Z and consulting with either Z.G.'s parents, her psychologist or other school professionals. (transcript 161). A learning specialist, with special education training observes the class three days per week. (transcript p 181, 194) Based on Z.G.'s educational needs, the special education consultant develops specific strategies to assist Z.G. and consults with Ms. Terpening so that she can help implement these strategies. Ms. Terpening also consults and coordinates with Z.G.'s other teachers, psychiatrist, psychologist, and her mother. (transcript p. 159, 166, 170-171, 182-183), 188). The school also provides a full-time psychologist onsite that Z.G. periodically meets with to help her manage the symptoms of her illness. The presence of a full-time nurse is crucial to help monitor the potential side effects of her medication. The nurse's office also has been utilized to help

Z.G. decompress when her anxiety becomes overwhelming and an onsite psychologist also is available for Z.G.

Dalton itself provides a level of structure which inherently necessary for Z.G. to learn. (transcript p. 112-113) Due to Z.G.'s bipolar disorder and ADHD, an over-stimulated environment would be detrimental to her. Dalton's significantly smaller class size enables Z.G. to receive the individualized attention she requires. ( transcript p. 29) A larger classroom would foreclose any real opportunity to learn.

Finally, and unique to Z.G educational needs, is that she requires an academically rigorous program. Dr. Austin and Ms. Terpening both opined that Z.G.'s hyper focusing/hypo mania requires that Z.G.'s mind be fully engaged throughout the school day. Most of her classes at Dalton are taught higher than grade level, thus, Z.G. is able to engage her mind in such a way as to prevent de compensation. (transcript 162)
In sum, according to Ms. Terpening, Z.G. should not be placed in a New York City Public School without any support. She stated that it is "difficult to imagine," she would "suffer on every level," and her social and emotional well being would be at a very dangerous level. (Transcript p. 174)

According to Ms. Terpening, Z.G. needs small classrooms, someone to check on her daily maintenance, organization, and assignments, a rigorous curriculum or she will zone out and not engage. She needs nurse accessibility, school psychologist accessibility, and a teacher support system. (Transcript p. 174-76) According to Ms. Terpening, she needs to intervene two or three times a day to keep her on track. (Transcript p. 188)

The cases cited by defendant are inapplicable. The cases cited by defendant concern the classification of emotional disturbance, a definition significantly different

7

than OHI.  For example, in *Muller v. Committee on Special Education of the East Islip Union Free School District*, 145 F.3d 95, 103 (2nd Cir. 1998), the Court held that one had to show an inability to learn, a definition far different than OHI.  However, even in that case, the Court ruled that when academic performance improves when the problems are being addressed clinically, supports the conclusion of an inability to learn.   Likewise in this case, the interventions support the conclusion that her bipolar disorder and ADHD is adversely impacting Z.G. educationally.  See *also New Paltz Central School District v. St. Pierre,* 307 Supp.2d 394 (N.D. N.Y. 2004) and *N.C. v. Bedford Central School District* ,473 F.Supp2d 532 (S.D., N.Y. 2007)

  The DOE also relies on *J.D. v. Pawlet School District,* 224  F.3d 60 (2nd Cir. 2000), however, this case deals specifically with the Vermont Educational Regulation; also, see L.I. v. Maine School Administrative District No. 55, 480 F.3d 1 (1st Cir. 2007) confirming that the Second Circuit reached its decision in *J.D. supra* by applying the highly specific definition of "adversely affects educational performance"  set forth in state law.  The Court further stated that the federal regulation does not contain the significant impact requirement and that the District Court correctly ruled that any negative impact, regardless of degree, qualifies as an "adverse effect" under the relevant federal and state regulations.  Despite the fact that L.I. had above-average academic performance, she still had social and communication deficits that required the conclusion that her inability had exerted an adverse effect on her educational performance.  Similarly, in this case, it is clear that Z.G's condition has exerted an adverse effect on her educational performance.

  However, the District Court in the Western District of New York, defined 'other

health impaired' as a condition that limits strength, vitality or alertness, in turn, resulting in limited alertness to the educational environment and adversely effecting educational performance. *Corchado v. the Board of Education, Rochester City School District,* 86 F. Supp.2d 168 (W.D., N.Y. 2000) citing 34 C.F.R. 300.7 (b) (8) Because the seizures, even with medication that limited the seizure disorder, caused him to miss school, the seizure disorder met the definition of OHI. The seizure disorder disrupted the learning process not just while they occur but for a post seizure period that impacts on memory. (The seizures occurred about every two weeks) This means that for a period of time during the day, the student is not a learner nor is physiologically able to encode new information into his memory. In sum, the student had a condition that resulted in "limited alertness with respect to the educational environment" and which has adverse effects on his educational performance. The IHO held that the student was satisfactorily achieving and thus could not be OHI. The District Court made a point in reversing that ruling and holding that the fact that a child despite a disability, receives some educational benefit from regular classroom instruction should not disqualify the child from eligibility for special education benefits if the disabilities are demonstrated to adversely affect the child's educational performance. Denying a child educational benefits because he is able to pass from grade to grade despite the documented impairments that adversely affect his educational performance is wrong.

   In the case at bar, Z.G.'s condition impact on her ability to process information, causes her to have to leave the classroom on multiple occasions and causes the teacher to have intervene on average three times a day. Like *Corchado*, Z.G. is compelled to miss school, (her attendance suffered dramatically in third grade) and is out of class at the

9

nurse's office, at the psychologist office and needs to constantly redirected.

Here, the DOE has utterly failed to address the fact that the extensive intervention strategy in place that supports Z.G. has directly impacted her success at Dalton. Without these special education and related services in place for Z.G., she would be adversely educationally impacted by her severe case of bipolar disorder with rapid rapid cycling and her ADHD. Ms. Terpening's testimony sets forth in vivid detail the impact the bipolar disorder had on Z.G. and that without the comprehensive support services in place, Z.G. would not just be educationally adversely affected but would likely fail.

### 5. The Placement at Dalton was Appropriate

The DOE argues, even if Z.G. should have been classified as OHI, since the services were not special educational and related services, Dalton was not appropriate placement. However, as stated in plaintiff's memorandum in opposition to defendant's summary judgment, pages 11-14, the regulations are clear that the services provided are special education and related services.

IHO Stern succinctly summarized the reasons why the placement at Dalton was appropriate. Z.G. is making significant academic progress. It is clear that Dalton has developed a thoughtful and flexible approach in providing an appropriate learning environment for Z.G. (page 8 of IHO Findings of Facts and Decision)

### 6. Equitable Considerations Support the Parents

Without a scintilla of evidence, the DOE speciously asserts that the parents would not have accepted the placement if the DOE had done the right thing and offered a placement in a public school with support services. The parents categorically deny that assertion. The parents would have preferred to send their child to a public school rather

than a private school. However, the failure of the DOE to offer any support services whatsoever in a general public school setting compelled the parents to reject the IEP.

Equitable considerations fully support the parents. Z.G.'s parents fully cooperated with the CSE/IEP process. They referred their daughter for an evaluation, provided a social history, independent evaluations, and attended the CSE meeting. Furthermore, the parents enrolled and paid for their daughter to attend Dalton for two years without seeking reimbursement. This indicates that the parents enrolled their daughter in good faith and out of a legitimate concern for her well-being. (See page 9 of the IHO decision)

Accordingly, all three of the Burlington/Carter factors should be decided in favor of Z.G. and Z.G.'Motion for Summary Judgment should be granted in its entirety and DOE's summary judgment should be denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiff C.B. on Behalf of Z.G., respectfully requests that this Court grant plaintiff's summary judgment in all respects, that the determination of the SRO be vacated, and that the Court finds that the DOE had failed to offer a free and appropriate education to Z.G. Plaintiff C.B. on behalf of Z.G. also respectfully requests that the Court find that Dalton was an appropriate placement, that equitable factors support an award of tuition reimbursement and that C.B. on behalf of Z.G. be awarded tuition reimbursement for her attendance for the 2005-2006 school year together with costs, a reasonable attorney fee, and disbursements and for such other relief as the Court deems just and appropriate. In addition, the Plaintiff would respectfully request that defendant's motion for summary judgment is denied in its entirety.

Dated:  New York, New York
        November 21, 2007

                                         Respectfully submitted,

                                         s/Neal Howard Rosenberg, Esq.
                                         NEAL H. ROSENBERG (NR 7827 )
                                         Attorney for Plaintiff
                                         9 Murray Street, Suite 4W
                                         New York, N.Y. 10007
                                         (212)  732-9450

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment was served via EC Filing system to Michael A. Cardozo, Corporation Counsel of the City of New York, Attorney for the Plaintiff, 100 Church Street, Room 2-121, New York, New York 10007, by Andrew J. Rauchberg (AR 2179), Assistant Corporation Counsel on this 21st of November, 2007.

                                         s/Neal Howard Rosenberg